**GRADE–WAY CONSTRUCTION, Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**Ball & Brosamer, Inc. and Ball, Ball & Brosamer, Inc. (A Joint Venture), Intervenor.**

No. 1–85C.

United States Claims Court.

Jan. 16, 1985.

---

Carl J. Peckinpaugh, Washington, D.C., for plaintiff. L. Stephen Quatannens, Hamel & Park, Washington, D.C., and Robert L. Leslie, McInerney & Dillon, P.C., Oakland, Cal., of counsel.

Victor Maddox, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant. Justin P. Patterson, Sherry Kinland, Dept. of Interior, Washington, D.C., of counsel.

John R. Little, Jr., Denver Colo., for intervenor. Frederick L. Miller, Jr. and Charles Holum, Duncan, Weinberg & Miller, P.C., Denver, Colo., of counsel.

## OPINION

YANNELLO, Judge.

Plaintiff is the second lowest bidder and intervenor the lowest bidder. Plaintiff protests any award to intervenor on the grounds that its bid is not responsive to the solicitation as amended.

In a stipulation filed on January 9, 1985, the parties agreed to many of the facts in this case. They need not be restated in detail here. However, in view of the rather interesting turn this case has taken, it is well to begin this opinion with a brief statement of some of the general principles of the law of government contracts as they apply to contract award.

It is an obvious precept that a contract can be awarded only to a bidder who fully responds to the government invitation for bids ("IFB" or "solicitation"). *See, e.g.,* Federal Acquisition Regulation (FAR) § 14.301. If the government solicits bids to supply pens, it cannot award the contract to a bidder who offers pencils. The non-responsive bidder has not offered or agreed to a contract based on the solicitation, but rather has made a counter-proposal. In the context of competitive bidding, if the government finds such a counter-offer to be acceptable it must withdraw or cancel the original solicitation and issue a new IFB allowing all interested parties to submit bids on revised terms. Any principle to the contrary would result in unfairness to the other responsive bidders (those who offer to supply pens) and would violate the very purposes and the integrity of the system of competitive bidding.

■ This rule has exceptions. Where the defect or omission in the non-responsive bid is trivial or a matter of a mere formality, the law does not require that the entire bid be rejected. Rather, pursuant to the Federal Acquisition Regulations FAR § 14.405, and under the particular circumstances specified therein, a bidder may be given an opportunity to cure the defect or the government may waive those terms to which the bid does not respond.

■ The next rule (flowing from the first but perhaps not as obvious) is that the government cannot compel a bidder who is not responsive to the solicitation to accept an award of the contract in the precise terms of the solicitation. That is to say that a bidder cannot be compelled to accept a contract to perform work or incur costs under terms other than those in the IFB to which it has responded and agreed. This principle is self-evident in circumstances where a bid fails to respond to a material item in an IFB. It is perhaps less clear, although nonetheless equally applicable where the defect which renders the bid non-responsive concerns a relatively minor or minimal item of the solicitation.

■ Where the deviation from the solicitation is a minor informality or a matter of mere form, FAR § 14.405 provides only that the bidder may be given an "opportunity to cure" the defect or omission in its bid, and thus to enter into a contract precisely and entirely in accord with the solicitation. In its normal and everyday meaning, this phraseology connotes consent by the bidder to be so bound. The court found no authority which would permit the government to *compel* such curative action, leading to contract award and performance, even where a triviality is concerned. And although advised of the court's interest in this line of inquiry, none of the parties here has provided any authority to support the proposition that such compulsion would be appropriate. Thus, if the bidder elects not to cure the defect, the terms of the solicitation to which it did not respond would be waived by the government in any contract awarded pursuant to that IFB.

■ A third principle upon which competitive bidding is founded is that a bidder generally should not be permitted any option to reaffirm, change, or withdraw its bid after the bids are opened and it has had an opportunity to see the other bids. (The exceptions to this rule in the event of clear mistake and clerical error are discussed in FAR § 14.406, concerning correction or withdrawal of the bid.) The reasons for

this rule are, of course, obvious. As a consequence of this rule, any circumstances or procedures which may allow such options are to be closely examined.

■ One such circumstance occurs in the context of non-responsive bids. Where the defect or omission is material, the bid is rejected by the government as non-responsive, and the bidder is given no option to make a correction and stay in contention for contract award. Where the defect is trivial or a matter of mere formality, however, FAR § 14.405, affords the bidder an "opportunity to cure." As noted above, this provision connotes voluntary action by the bidder. Thus, this regulation must be carefully construed in order to prevent a situation wherein the bidder might, by failing to agree to cure the minor defect, effectively elect to have its bid cast out as non-responsive. The regulation itself addresses this problem by providing that in lieu of correction by the bidder, the merely trivial terms not responded to may be waived by the government and omitted from the contract. (Indeed FAR § 14.405 gives to the government, in its own best interest, the option of permitting cure by the bidder or waiver by the government.) It must be concluded that if the defect is one which the government cannot waive, FAR § 14.405 cannot apply. If not waivable, the defect cannot be deemed trivial and the bidder cannot alone determine (by electing or failing to cure the defect) whether its bid will survive (as cured and responsive) or, in effect, be withdrawn as defective, uncured, and non-responsive.

With this background in mind, we turn to the instant case. Here, the initial solicitation was amended. In order to assure that bids were responsive not only to the original IFB but to the amended terms as well, the bidders were required to acknowledge receipt of each amendment. The lowest bidder (intervenor herein, referred to as B, B & B) failed to acknowledge amendments 5 and 6; plaintiff acknowledged all amendments.

In addition to the general language discussed above, FAR § 14.405(d) provides

that failure to acknowledge an amendment is a minor irregularity (not vitiating its responsiveness) *only if:*

(1) The bid received clearly indicates that the bidder received the amendment, such as where the amendment added another item to the invitation and the bidder submitted a bid on the item; or

(2) The amendment involves only a matter of form or has either no effect or merely a negligible effect on price, quantity, quality, or delivery of the item bid upon.

The first of these provisions, subparagraph (1), is not in issue here inasmuch as there is neither allegation nor evidence that acknowledgement of either of the two amendments was ascertainable from intervenor's bid itself.

The second of these provisions, subparagraph (2), is the focus of the parties' presentation. The parties agree that when examining price, consideration should be given to the cost attributed to the amendment itself, the total bid price, and the comparison with other bidders. Plaintiff alleges that the effect of each of these amendments upon its bid was significant or, in any event, not negligible. Intervenor alleges that the effect of amendment 5 upon its bid would be not only negligible and trivial (or *de minimis*), and that the amendment has no effect whatever. While these allegations (and the evidence introduced in support thereof) will be the subject of further discussion, some important observations are appropriate at the outset.

■ The determination of the contracting officer (CO) regarding the responsiveness of bids will be upheld if, as to factual matters, it has a rational basis. The basis upon which the CO makes a determination of responsiveness is the bid itself, not extrinsic evidence. Moreover, the standard by which responsiveness is to be judged is the effect upon the price, quality, quantity, or delivery "of the item bid upon." FAR § 14.405(d)(2). Such evaluations are not made on the basis of extrinsic evidence concerning the two protagonists here, or

indeed of all bidders. Rather, in the interest of efficiency and expediency, the CO must determine what the likely or probable effect upon the item would be for a reasonable, prudent bidder. If, and only if, such effect is calculated to be negligible, can the bid which failed to acknowledge an amendment be construed as responsive and considered for contract award. Thus we turn to the amendments here in issue and an examination as to their probable effect upon a reasonable bidder.

The IFB, as previously amended and acknowledged, provided that (1) the contractor would comply with the terms of the Davis-Bacon Act and 40 U.S.C. §§ 276a–276a–5 and would pay the wage rates as determined by the Secretary of Labor for the particular project (see Specifications, ¶ I.7.1, Labor Standards); and (2) the specific wage rate for electricians' fringe benefits was $6.88 per hour per the attached schedule. Amendment number 5, here in issue, modified an earlier schedule so as to provide that the specific wage rate for electricians' fringe benefits was $7.88. The number of hours for electricians' work was estimated at 100 (by intervenor), 400 (by the agency), and 1500 (by plaintiff). This item could affect only the contractor's cost and hence the bid price, and would have no other impact upon the scope of work (quality, quantity, or delivery of the item). The maximum amount involved is thus $1500.

The IFB provided that the soil placed in zones 1 and 1A would consist of four types of material: (1) silty sands (SM); (2) clayey sands (SC); (3) inorganic silts (MC); and (4) inorganic clays of low to medium plasticity (CL) or "lean" clay. An earlier amendment added the language that no "fat" clay would be allowed in zone 1A.[1] Amendment

6 provided that no "fat" clay would be allowed in zone 1.

The IFB was issued on August 28, 1984, and called for bid opening on October 16, 1984. This was subsequently extended, by an amendment acknowledged by both plaintiff and intervenor and not here in issue, to October 30, 1984. The IFB provided that bids would remain open and subject to contract award for 60 days (or until approximately December 30, 1984, given the revised bid opening date) and any bid that did not comply with this agreement would be non-responsive.

The IFB also provided that work would commence within 30 days of the issuance of the notice to proceed.[2] It further provided that the access road from Union Road was to be completed by July 1, 1985[3], and that the entire contract was to be completed within 840 days of the issuance of the notice to proceed. (In this solicitation, there was only one date certain, for the Union Road access. The completion schedule for the rest of the work was based on a fixed period rather than a date certain.) It was also noted that the completion date was based on the *assumption* that the notice to proceed would be issued by October 12, 1984. (If the notice to proceed were issued on October 12, 1984, the completion date would be computed as January 30, 1987.) If the notice to proceed were issued after October 12, 1984, for reasons other than contractor's delay, the completion date would be similarly extended.

Thus, the terms of the IFB, as previously amended, permitted award of the contract as late as December 30, 1984, with a notice to proceed to be issued at that time or shortly thereafter. The schedule of completion for the entire contract was 840 days

---

1. Fat clay differs from lean clay, and indeed from all of the four materials of which the zones were to consist in the original IFB, in a number of ways, including plasticity and liquid limits. For example, "lean" clay has a low to medium plasticity and a lower liquid limit, whereas "fat" clay has a high plasticity and a higher liquid limit than lean clay.

2. As all parties have agreed in the context of this suit, a considerable and significant amount of

start-up effort is required before excavation and construction can begin. The phrase "commencement of work" alludes to the initiation of this start-up effort and performance under the contract.

3. No issues have been raised in this action concerning the schedule of completion for the Union Road access road.

from that issuance and would thus be automatically adjusted for any delay in issuance. (If the notice were issued on January 1, 1985, the completion date would be computed as about April 20, 1987.)

▉ Amendment number 6, here in issue, retained the scheduled completion of the entire contract within 840 days from the issuance of the notice to proceed. It revised the specifications to provide an assumed date of December 12, 1984, for the issuance of a notice to proceed.

Finally, amendment 6 noted that all rights-of-way for haul roads and other items had been obtained but that the Pearce Quarry and its rights-of-way would not be available until January 1, 1985.

### 1. Pearce Quarry

One issue raised by plaintiff concerns the amendment, not acknowledged by intervenor, which would delay access to Pearce Quarry.

As plaintiff's witnesses testified, plaintiff anticipated a rapid initiation of work and completion of the contract within the first construction season (*i.e.*, by late fall of 1985). Plaintiff anticipated access to the Pearce Quarry as soon as the notice to proceed was issued. Plaintiff thus alleges that the revision in the solicitation resulting in access to the quarry not by December 12, 1984, but rather on January 1, 1985—a delay of some 20 days—materially impacted upon plaintiff's anticipated schedule. Plaintiff computed that it would cost some $100,000 in order to overcome the effects of this delay.

Intervenor, on the other hand, established that it had not anticipated such a zealous scheduling of work and that, indeed, preliminary work, which must be done before access to the Pearce Quarry would even become an issue for the reasonable contractor, would mandate that the quarry would be used no sooner than February 1985 in any event. Intervenor also

points to the rainy winter months as mitigating against full use of the period between mid-December and early January. Moreover, intervenor argues that, in any event, a delay of 20 days (a number of which were weekends and holidays) in an overall completion of 840 days is *de minimis*. Finally, intervenor argues that an expense of $100,000 (even if that were attributable to a reasonable contractor using a realistic construction schedule) is itself *de minimis* and would be *de minimis* when compared with the lowest bid of over $11 million and with the difference between the next lowest bid (that of plaintiff) of $300,-000.

The GAO, in a decision rendered January 11, 1985, in the matter of *United States Department of the Interior*, No. B–217303 (in fact, the instant dispute in which the government requested an advisory opinion from the agency), essentially agrees with the intervenor. This decision is of interest although in no way binding on this court.

The court agrees that the amendment has a negligible effect upon the price, quality, quantity, and delivery of the item bid upon, but for reasons not articulated by the intervenor or the government.

The terms of the IFB permitted contract award as late as December 30, 1984, with the notice to proceed to be issued at that time or shortly thereafter. Although an earlier date was assumed for purposes of establishing a completion date, no earlier date was required.[4] If contract award had been made at the latest possible date, access to Pearce Quarry on January 1, 1985 would have no effect whatever since that date would indeed be the first day of any possible contract performance.

All that amendment 6, issued on October 19, 1984, did in this respect was to note that the initially assumed date for issuance of the notice to proceed had expired, and that a new date was assumed for this pur-

---

**4.** The previous discussion of the facts notes that the adjustment in any dates certain for contract performance was automatically provided for both in the initial IFB and in the amendment in issue. Here, the completion schedule was stat-

ed in terms of a fixed period, 840 days from the notice to proceed and thus the estimated completion date would automatically be extended as the issuance of the notice to proceed was protracted.

pose. Further the amendment called attention to the fact that access to the quarry would post-date this revised assumed date for the notice to proceed but, again, the actual award and notice could come as late as December 30, 1984, in any event under the terms of the initial IFB. The only other adjustment which would be relevant would be an extension of the completion date given the completion schedule. This also would flow from the language of the initial IFB itself even without the amendment since the completion schedule was stated as a fixed period from the actual issuance of the notice to proceed rather than a date certain.

Thus, it is clear that the terms of amendment 6, insofar as they deal with the access to Pearce Quarry, merely served as a formality, setting forth with specificity a revision in the completion schedule which would flow as well from an application of the formula contained in the initial IFB. Because the issuance of the notice to proceed was only assumed or estimated for purposes of the completion schedule, and because the government was already entitled to award the contract as late as December 30, 1984 (actually extended by the plaintiff and intervenor here to January 29, 1985, in view of the bid protest), this amendment was a mere technicality and its effect was nil.

Since the effect of the amendment was negligible and because the same result would follow from a waiver of its terms altogether and the appropriate adjustments applied to the terms of the initial IFB itself, the intervenor's failure to acknowledge amendment 6 does not render its bid non-responsive in this regard.

### 2. Soil Composition

Amendment 6 also provided that no "fat" clay could be used in zone 1 of the dike embankment.

It cannot be disputed that the initial IFB specified the four materials of which the dike embankment shall consist and that "fat" clay was not among them. Thus, there was never any reasonable intention to use fat clay in any significant way.

Plaintiff's witnesses established that the composition of the material being excavated from the dam site would contain, in some places, thin layers of fat clay. In the process of excavation, some of this fat clay might find its way into loads of the other four, acceptable, materials for dike embankment and thus the total absence of this substance could not be assured and would not be necessary under the terms of the initial IFB. Plaintiff alleges however that the new amendment, stating that no fat clay was to be present, required it to anticipate a more careful sifting and stockpiling operation, with a tighter degree of quality control, to assure that no fat clay whatever was placed in the embankment. Plaintiff further estimated the cost of this additional effort to be about $50,000.

Intervenor, on the other hand, established that the language of the amendment merely emphasized the initial IFB which itself limited the embankment materials to those other than fat clay. The government designer of the specifications, Dr. Smart, testified that the acceptability of the embankment fill would be evaluated by taking random test samples. Loads of fill would be ordered removed if not in compliance with the specifications. This witness discerned no difference in testing techniques or in evaluation criterion for acceptibility between the initial IFB and the terms of the amendment.

The GAO decision referred to above essentially agreed with the positions of the intervenor and the government and, while reaching its own determination in this respect, this court reaches a like result.

As noted above, at no time even under the initial IFB was fat clay recognized as an acceptable material of which the dike embankment should consist. Plaintiff, however, envisioned a method of excavation and quality control which would result in some, albeit minor, amounts of fat clay remaining in the bank material excavated from the dam site where fat clay was present in thin irregular strata. With the advent of amendment 6, plaintiff felt ob-

**270**

liged to take stronger steps to assure removal of as much fat clay as possible, leaving only the smallest amounts in the soil which would be placed on the dike. Plaintiff acknowledged that there would be no practicable way of assuring the total absence of fat clay in the embankment soil.

Thus, it appears to be a matter of degree envisioned in the initial quality control. If the initial IFB were read, as it well should be, as defining the only four materials of which the embankment should consist, then every possible and stringent method of quality control, within reason, should have been anticipated from the outset to assure the absence of as much fat clay as possible. After acknowledging amendment 6, the plaintiff then apparently augmented its initial design so as to assure this degree of stringency. It is quite likely, however, that another reasonable bidder would have included those efforts, given the language of the initial IFB, and that the amendment would have had no effect in this regard other than providing emphasis. Indeed, in plaintiff's case at least, such emphasis was not misplaced and was apparently needed to assure compliance with the terms of the initial IFB itself.

The desired quality could be obtained even from the initial IFB terms, and the amendment merely added some measure of emphasis. Failure to acknowledge the amendment in this respect did not render intervenor's bid nonresponsive.

*3. Davis-Bacon Wage Determinations*

Finally we turn to the issues concerning amendment 5. This amendment revised, upward, the specific schedule of fringe benefits for electricians as determined by the Secretary of Labor pursuant to the Davis-Bacon Act (DBA), 40 U.S.C. § 276a (hereinafter sometimes also referred to as "the Act".)

There was little testimony in connection with this issue. With respect to the maximum amount of cost involved (and hence possible impact upon price), this amount of $1,500 is clearly *de minimis* and negligible in terms of the amount itself, and when compared with the lowest bid (over $11 million) and the difference between that and the next lowest bid (a difference of $300,000).[5]

Moreover, it has been found that the intervenor did not have a collective bargaining agreement requiring it to pay at least the higher, revised, amount determined under the DBA. Intervenor did have contracts with the union with respect to five crafts (including carpenters, laborers, masons, and others) but these did not extend to electricians. Moreover, it has been determined that the language in these agreements limiting intervenor's subcontracts to the terms and conditions of the agreements themselves extended only to the crafts with which the agreements had been reached and not to others, such as electricians. Finally, based on testimony from plaintiff's witness as well, we cannot rule out a possibility that subcontracts with electricians may involve non-union workers not covered by wage rates at least equal to those determined in the revised DBA schedule. These determinations distinguish the instant case from a recent decision by GAO upon which intervenor relies. *See, e.g., Brutoco Engineering and Construction Co.,* 62 Comp.Gen. 111, 83–1 CPD ¶ 9 (1983).

▮▮▮ It is important to note, however, that the intervenor here has established that it intends to subcontract any electrical work through a subcontractor whose agreements, through collective bargaining, assure payment of wage and fringe rates at least equal to those specified in amend-

**5.** The discussion herein is limited to the issue of electricians. Plaintiff notes that there is a possibility that other crafts may be involved as well, as the work progresses. However, intervenor's witnesses testified that no such other crafts (as had been identified by plaintiff) could reasonably be anticipated and, in the absence of any probative contrary evidence, this court so finds.

One can never rule out any possibility whatever that such other crafts will be called upon, but we properly limit our consideration to those crafts which might reasonably be anticipated and, here, this applies only to the electricians and the maximum reasonable estimate of their work.

ment 5. However, in a case such as this, resort to such extrinsic evidence is inappropriate. Intervenor was under no legal obligation to enter into such subcontracts. Moreover, a bidder should not be able to turn an otherwise unresponsive bid into a responsive bid by *electing* to act, after bid openings, in a way so as come into compliance with unacknowledged amendments and hence make itself eligible for contract award. Nor should that bidder be able to elect whether to come forward with extrinsic evidence of such complaint action after bid opening.

Intervenor argues that this is not the case and that the modified wage schedule contained in amendment 5 was already incorporated into the contract by virtue of two provisions. First, intervenor points to the general language of the initial IFB to the effect that the Secretary's schedules will be appended as a part of the contract and that the contractor shall pay wages accordingly. Such general reference, however, is insufficient under the Act. The Act requires that the specific schedules applicable at the time be incorporated *into* the solicitation.[6]

■ Second, intervenor relies upon the doctrine enunciated in *G.L. Christian and Associates v. United States,* 160 Ct.Cl. 1, 312 F.2d 418, *reargument denied,* 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), and known as the Christian Doctrine. Intervenor alleges that since the specific schedules were required by law to be in the solicitation, it shall be read in by operation of the Christian doctrine. This court does not agree.

The Christian doctrine has been applied essentially to clauses involving the government's administration of a contract (such as terminations, changes, and the like), but not to specific terms and specifications. Moreover, the clauses customarily encompassed by that doctrine have contained provision for compensation to the contractor for any increased costs (if not, in all cases, including profits or consequential damages). We know of no authority which would apply the Christian doctrine to a situation of this type or which would permit the reading into a solicitation of higher wage determinations (with no concommitent increase in the bid price).

Moreover, application of a doctrine of contract construction developed by the courts, such as the Christian Doctrine with respect to incorporation by operation of law, cannot be applied in direct conflict with the clear terms of the statute (and regulations) requiring physical incorporation. The provisions of the DBA are clear in this regard and, as the parties have noted, physical incorporation eliminates any uncertainty as to the specific rates applicable to a particular location or project. 29 C.F.R. § 1.6 (1984), provides that the expiration of a schedule of wage rate determinations may be extended or a new schedule requested as may be necessary to obviate a void between solicitation, bid opening, and contract award (subsection (a)(1)); moreover, project and general determinations which are revised or modified will be effective even if issued within 10 days of bid opening *unless* the agency reports that there is insufficient time to notify bidders, thereby assuring not only that the modifications are published but

---

6. Only one situation has been noted in which a slightly different contract was upheld. In *Bushman Construction Company v. United States,* 143 Ct.Cl. 264, 164 F.Supp. 239 (1958), the specific schedules were not available at the time of the issuance of the solicitation, so a provision was included therein providing that prior to bid opening the schedules would be furnished to the bidders as they were promulgated. Accordingly, a supplement (or amendment) to the IFB was issued in which it was stated that the rates were the subject of contemporaneous consideration and the new rates, when determined, would be substituted for those in the IFB and that the contractor would pay such rates without an increase in the contract price. The court determined that the parties had clearly agreed to be bound by rates determined after the execution of the contract; that such terms did not render the contract unlawful or confer any rights on the contractor (since inclusion of specific rates in the solicitation as required by the DBA was for the benefit of the workers and not the contractor); and that plaintiff could not recover for any increased costs incurred as a result of the upwardly revised wage rates.

272

that they are actually included in the solicitation prior to bid opening and contract award (subsections (c)(2) and (c)(3)). Finally, 29 C.F.R. § 1.6(f) provides that if a solicitation is missing a wage determination or contains an erroneous determination, the resulting contract may be terminated and resolicited or the proper determination may be applied retroactively with a change order issued to compensate the contractor. This provision would be rendered meaningless, and contractors deprived of deserved contract modification and price adjustment, if the courts, by operation of the Christian Doctrine, were to read into all solicitations (and resulting contracts) the current and correct determinations.

Hence, it is concluded that the Christian Doctrine will not operate so as to read into the solicitation the wage determinations contained in the schedule set forth in amendment 5 and not acknowledged by intervenor.

Summarizing the above discussion, it has been found that the statute requires that the specific wage rate determinations by the Secretary be included in the solicitation; that such provisions are not incorporated by operation of law under the Christian Doctrine; that intervenor had no outstanding legal obligation to pay wage rates equal to or in excess of those stated in the Secretary's modified schedule for electricians' fringe benefits; and that the likely or probable effect upon the price of the item being bid, by a reasonable bidder, would indeed be *de minimis* or, in the terms of the FAR, negligible.

Intervenor and the government argue that the *de minimis* nature of the effect upon price is, under FAR § 14.405(d)(2), enough to preclude a finding of non-responsiveness. The court disagrees.

Failure to acknowledge the amendment containing the modified schedules and rates can be treated as a minor formality only if the government can waive the provision. While the bidder here would take advantage of an opportunity to cure its defect and acknowledge the amendment, this option alone cannot render the bid responsive,

for to permit such action would place a bidder in the position of having an election to take or avoid the contract after bid opening, as discussed at the outset of this opinion. The opportunity of a bidder to cure must be taken into consideration only when there is a corresponding right of the government to waive the provision if such curative action is not taken. Here, the payment of specified rates (in this case those set forth in amendment 5) is mandated by the DBA and the government is powerless to waive such requirements. Thus, if intervenor were to prevail here, a rule would be established whereby the sole control over whether the bid was rendered responsive or not would rest with the bidder—an unacceptable procedure impugning the integrity of the entire competitive bidding system.

Both the intervenor and the government point to two other aspects of government contract law which they seek to apply to this circumstance to return some measure of control to the government and out of the hands of the bidder seeking two bites of the apple. The first is the practice by which the government could, by change order issued after contract award, require the contractor to pay the applicable and specified rates. This, of course, presupposes a valid contract award to a responsive bidder and cannot retrospectively render as responsive a non-responsive bid. Moreover, the issuance of such change orders, compensating the contractor for the increased costs, would be appropriate only where the solicitation itself was deficient (in omitting the schedules or in including erroneous data), which is not the case here. *See, e.g.,* 29 C.F.R. § 1.6.

The second procedure relied upon is the ability of the government to withhold contract payment to cover any wage rates not paid by the contractor. The government may also terminate the contract for failure to abide by its provisions for payment of the determined wage rates. (The workers may themselves have an action, but this is not a sanction which would be available to the government.) These procedures are in-

deed available, but again they presuppose the valid award of a contract to a responsive bidder. They are post-award remedies, and do not serve to render a non-responsive bid responsive. Indeed, it is precisely to avoid the necessity for such remedial action that every effort is made to see to it that the contract is awarded to a bidder who fully responds to the obligations set forth in the solicitation.

Moreover, a failure to acknowledge amendment 5, and to take any curative action, would result in a contract award, if any, containing only the initial and outdated wage determinations (since higher wages could not be forced upon the non-acknowledging bidder) and the remedial action noted above would not be available to secure payment of the higher determinations not incorporated in the contract.

Thus, since the government has no option to waive the provisions of amendment 5 and the modified wage determinations of the Secretary, regardless of how *de minimis* or negligible their impact upon the price of the item bid, a failure to acknowledge those provisions of the solicitation prior to bid opening renders the bid non-responsive.

While this court is not bound by decisions of the GAO, that agency has, in the past, been a source of considerable doctrine which has been of interest if not persuasive. In the context of the instant case, GAO has, for the past 20 years, announced a doctrine similar to that being implemented in this decision. *See, e.g.,* No. B–174647 at 51 Comp.Gen. 500 (1972), which decision also notes an inability of the government to compel the bidder, without its consent, to pay the specified rates; *McHenry Cooke,* No. B–196138, 80–1 CPD ¶ 74 (1980); *Morris Plains Contracting Inc.,* No. B–209352, 82–2 CPD ¶ 360 (1982) and cases cited therein; and *Protex Systems Inc.,* No. B–213228, 84–1 CPD ¶ 265 (1984).

In recent decisions GAO has made a modification in this doctrine, holding that where the bidder is already legally bound, through its collective bargaining agreements or otherwise, to pay rates equal to

or greater than those specified in the wage determination amendment, a failure to acknowledge the amendment will not render the bid nonresponsive. *Brutoco, supra.* Without commenting on the correctness of that decision, it is noted here that this situation is not present in the instant case, as discussed above.

In its decision of January 11, 1985, in the instant case, the GAO goes further. It now extends *Brutoco* (which involved a legal contract obligation between the bidder and its workers at the time of bid opening) to provide that any failure to acknowledge the wage determination amendments, if *de minimis* in amount, may be cured after bid opening even in the absence of the binding union agreement. While this court agrees with the rationale of the earlier line of GAO decisions, it must respectfully disagree with the present decision. It is true that the workers will be protected by intervenor's post-bid-opening affirmation of amendment 5 and that the difference in amount attributable to the modified wage determinations when compared with the total price of the project and the difference between intervenor's and plaintiff's bid is *de minimis* and that, consequently, plaintiff will not be prejudiced by this post-opening acknowledgment.

Nonetheless, by permitting post-opening elective curing of an otherwise non-responsive bid, this practice gives two effective bites of the apple to intervenor and could lead to practices which would frustrate the competitive bidding system.

Thus, it is concluded that the failure to acknowledge an amendment relating to Davis-Bacon Act wage determinations and modifications by the Secretary of Labor renders the intervenor's bid non-responsive and not subject to elective cure after bid opening.

## CONCLUSION

It is concluded that intervenor's failure to acknowledge amendment 6, both with respect to dates of access and soil composition, is not material, does not render the

bid non-responsive, will have only a negligible, *if any*, effect upon the price, quality, quantity, and delivery of the item being bid, and can, if necessary, be waived by the government without resulting in any material changes in the project or the solicitation.

With respect to amendment 5, the failure to acknowledge renders intervenor's bid non-responsive for the reasons noted above and an award to intervenor would be improper.

The foregoing is by way of declaratory judgment as requested by plaintiff in its initial brief. Having made such declaration, it is usually unnecessary for the court to go further and to permanently enjoin the government from making an award to a bidder which has been found to be non-responsive because the government normally takes appropriate action on its own accord. In the instant case the government indicated during trial that it had not yet completed its consideration of the bids, and had made no final decision regarding award. Under these circumstances, there appears to be no reason for this court to issue a permanent injunction against award to intervenor.

Plaintiff has also requested a permanent injunction (the merits of which were the subject of a trial conducted on January 14, 1985) against award of the contract to any other than itself. The court is not prepared to go that far inasmuch as there may be other considerations and impediments to an award to plaintiff not before us in this proceeding or as yet considered by the government. As noted above, the government has represented that it has not yet formally determined a prospective awardee. Accordingly plaintiff's motion for a permanent injunction prohibiting award of the contract to anyone other than itself is DENIED WITHOUT PREJUDICE. As the apparent lowest responsive bidder, plaintiff will presumably be given appropriate consideration by defendant.

Intervenor's request for injunctive relief prohibiting the award of the contract to anyone other than itself is hereby DENIED.

The foregoing rulings dispose entirely of all the motions of all of the parties currently before the court. Consistent with the foregoing, the complaint of intervenor is to be DISMISSED. The complaint of plaintiff shall not be dismissed until the government has completed its consideration of the bids and indicated its intention to make a specific award. If it intends to award to anyone other than plaintiff, such intention is to be made known to plaintiff sufficiently in advance of award to allow an appropriate motion to be made to the court for such further relief as plaintiff deems appropriate. If award is made to plaintiff, a joint motion for dismissal shall be filed. If such a motion is not forthcoming the parties shall file with the court a report on the status of the procurement by no later than January 25, 1985.