**M.W. KELLOGG CO./SICILIANA AP-PALTI COSTRUZIONI, S.p.A., a Joint Venture, Plaintiff-Intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 15–86C.

United States Claims Court.

April 30, 1986.

Joseph A. Artabane, Washington, D.C., for plaintiff-intervenor. Dennis J. Riley, Bruce J. Berger and Spriggs, Bode & Hollingsworth, Washington, D.C., of counsel.

Karen S. Fishman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. J. Stuart Gruggel, Jr. and Robert E. Little, Jr., Dept. of the Navy, and LTC Samuel J. Roser, Dept. of the Air Force, Washington, D.C., of counsel.

## OPINION

MEROW, Judge:

This pre-award contract matter comes before the court for decision on the merits following extensive expedited proceedings. The controversy concerns a solicitation for the design and construction of 460 Air Force family housing units at Comiso Air Station, Sicily, Italy. A protective order has been issued, causing the record to date to be placed largely under seal in order to protect the integrity of the remaining procurement process and to prevent the disclosure of confidential information gained through relatively unrestricted discovery.

Following defendant's decision to proceed with an award prior to the date this litigation could be resolved, an application for a temporary restraining order and a preliminary injunction was pressed by M.W. Kellogg Company/Siciliana Appalti Costruzioni, S.p.A., a Joint Venture (hereinafter plaintiff or Kellogg). Plaintiff based its motion on several alleged improprieties in the contract process, including the government's violation of procurement regulations.

A temporary restraining order was issued on March 11, 1986. This action was premised upon public policy gleaned from the Competition in Contracting Act, 31 U.S.C. § 3553. That legislation is addressed to similar bid protest matters before the Comptroller General and not to matters before the Claims Court. However, in enacting this legislation, which requires the postponing of contract award or performance pending resolution of bidding disputes, Congress necessarily established public policy in this regard. It was concluded that this policy, as expressed in legislation, should not be ignored in reaching an analogous decision with respect to a pre-award temporary restraining order. See United States v. Acme Process Equipment Co., 385 U.S. 138, 146, 87 S.Ct. 350, 355, 17 L.Ed.2d 249 (1966).[1] Where, as here, any subsequent termination of an awarded contract would cause the government to incur substantial additional cost, it was concluded that, as would be the case in an equivalent matter directly covered by 31 U.S.C. § 3553, resolution of the dispute should, if possible, occur prior to award or performance. See also 40 U.S.C. § 759(h)(2)(B) (procurement suspension pending decision on automated data bid protest matters). After trial on the merits had been completed, defendant reported that a significant offer submitted for the contract involved in this matter would shortly no longer remain open. So as to continue to preserve the status quo, to the extent possible, the temporary restraining

---

1. The Office of Management and Budget (OMB) has issued instructions to executive agencies to proceed with the procurement process as though no award or performance restrictions were contained in this legislation (OMB Bulletin No. 85–8). This direction stems from concerns over the constitutionality of action by the Comptroller General with respect to executive agency procurement matters. This OMB position has been rejected in Ameron, Inc. v. United States, 787 F.2d 875 (3rd Cir., 1986).

order was then lifted. This action was taken without prejudice to a resolution of the fully-presented merit issues, and the granting of whatever relief would, as a result, then be appropriate.[2]

Accordingly, the following findings on the issues raised are premised upon the record in this matter, including two hearings on preliminary matters and a trial on the merits. To avoid placing this opinion under seal pending any appeal, confidential information has not been included. The documents setting forth this undisputed information are, of course, on file as a part of the record.

### Facts

On March 29, 1985 defendant, through its agent, the Naval Facilities Engineering Command, Contract, Mediterranean, (NAVFAC), issued Request for Proposals (RFP) No. N62745–85–R–0038, soliciting proposals for the design and construction of 460 Air Force family housing units at Comiso Air Station, Italy. This turnkey construction procurement contemplated award to a joint venture composed of a United States firm and an Italian firm. The Italian firm had to be approved by an agency of the Italian government. The contract documents listed all such approved Italian firms. Proposals were to be received by July 15, 1985.

With respect to the sum available for this procurement, the contract documents provided to potential offerors included a clause, 1A.4 "Information Concerning Cost Limitations," which provided (in part):

> Pursuant to Applicable Public Laws for Military Family Housing, the Government has programmed $29,000,000 for the award of this contract. Proposals in excess of this amount, at the Government discretion, may be eliminted [sic] from further consideration; therefore, proposers should prepare their proposals so as to permit award at a price within this amount. * * *

a. This project is authorized and appropriated by Public Law at $32,200,000. The Navy intends to award a contract for full criteria houses (i.e. procure the best house per dollar that meets these criteria via turnkey evaluation procedures in accordance with the basis of award provision paragraph 1C.7). * * *

c. Public Law 97–214 Section 2853 allows the services to request additional funding authority from Congress. * * *

The difference between the $32.2 million authorized by Congress and the $29 million programmed by the Navy for this housing was attributable, in part, to a calculation as to the amount which must be reserved for unanticipated construction changes. In programming $29 million, the Navy used a five percent contingency rate.

With respect to the award of the contract, the documents furnished to potential offerors included a clause 1C.7, "Basis of Award," which provided:

> Subject to cost limitations (see paragraph entitled "Information Concerning Cost Limitations"), award will be made to that firm offering the lowest dollar to quality point ratio determined by dividing the offered price by the technical points assigned during the Government evaluation and selection procedure. The Government reserves the right to reject any or all proposals at any time prior to award; to negotiate with any or all proposers; to award a contract to other than the proposer submitting the lowest price offer; and, to award a contract to the proposer submitting the proposal determined by the Government to be the most advantageous to the Government. PROPOSERS ARE ADVISED THAT IT IS DEFINITELY POSSIBLE THAT AWARD MAY BE MADE WITHOUT DISCUSSION OR ANY CONTACT CONCERNING THE PROPOSALS RECEIVED. THEREFORE, PROPOSALS SHOULD BE SUBMITTED INITIALLY ON THE MOST FAVORABLE TERMS

---

**2.** Defendant has recently moved to reopen the record to submit evidence it has awarded the contract at issue. As any such award action would not be relevant to the resolution of the pre-award issues tried, this motion has been denied by separate order.

FROM A PRICE AND TECHNICAL STANDPOINT WHICH THE PROPOSER CAN SUBMIT TO THE GOVERNMENT. DO NOT ASSUME THAT YOU WILL BE CONTACTED OR AFFORDED AN OPPORTUNITY TO CLARIFY, DISCUSS, OR REVISE YOUR PROPOSAL. (See paragraph entitled "Evaluation Criteria.")

The "Evaluation Criteria" clause, 1C.14, provided (in part) that "Evaluation will be made on the basis of site design, site engineering, dwelling unit design, and dwelling unit engineering and specifications, energy conservation and cost." For the technical evaluation required, a 1,000 point system was set forth in the provisions made available to potential offerors. This was divided into possible maximum points as follows: Site Design, 290; Site Engineering, 100; Dwelling Unit Design, 430; Dwelling Unit Engineering & Specifications, 105; Energy Conservation, 75. Nonconforming items would receive a zero score.

Nine initial proposals were received by July 15, 1985. Upon technical evaluation by the Navy, no proposal was found to conform to the specifications. On turnkey projects such as the instant procurement, it was Navy policy to attempt to bring each proposal into compliance with the published specifications by sending a so-called "variance" letter listing the nonconformities involved. The applicable Navy turnkey instructions provided that "when it is determined that one or more nonconforming proposers are to be afforded the opportunity to correct the nonconformities, or to fill in omissions, or to furnish additional information ALL other proposers will be afforded the opportunity to correct all their nonconformities, fill in their omissions, furnish additional data or information, or revise price, if they so desire."

By letters dated August 6, 1985 the Navy notified each proposer that an opportunity was being afforded to modify the terms and conditions of the proposal, and that as this may be the only such opportunity, the proposal should include "the best and final offer from both price and techni-

cal standpoints * * *." Each letter enclosed a list of the items in the proposal which did not conform to the specifications. As an example, one such item in the August 6, 1985 letter to plaintiff stated: "provide minimum three feet hallway/passage width in-lieu-of 2'–6" indicated between utility room and family room for JAMN–4 units." Revised proposals were to be furnished to the Navy by September 9, 1985.

In evaluating the second proposals submitted by September 9, 1985, it was found that only one was technically conforming and, by letters dated September 19, 1985 to all proposers, the Navy sought another round of submissions by October 7, 1985. The September 19, 1985 letters also listed variances.

Upon evaluating the third set of nine proposals, it was determined that three were technically conforming. These included proposals submitted by plaintiff and the firm which eventually received the Navy's award recommendation. At this point a selection board was convened and met on October 30–31, 1985 in Madrid, Spain to evaluate the proposals. After receiving a technical evaluation presentation, the selection board determined to proceed to price evaluation and the proposal prices were unsealed for the first time. During the evaluation process, each proposal was identified only by a number, not by a firm name.

When prices were uncovered, it was established that only one of the three technically conforming proposals was within the $29 million programmed amount. This was plaintiff's proposal. The other two were among the five proposals which exceeded the programmed amount. Plaintiff's proposal price was the lowest of the nine received. On the dollar to quality point evaluation basis required for award, plaintiff ranked fifth of the nine proposals. Plaintiff ranked seventh on technical points. The proposal from the firm eventually recommended for award ranked second on both technical points and dollar to quality point ratio.

In this circumstance, Navy personnel made inquiries as to whether additional funds could be made available for this project and received a negative answer. The selection board was concerned that language in the specifications referencing both $29 million and $32.2 million and the provision suggesting that additional funds might be obtained under certain circumstances may have confused proposers such as to result in the majority of proposals being priced over $29 million. The board concluded that only one conforming proposal with a relatively low technical score was not adequate competition. It was determined that another round of best and final offers should be obtained after the funding matter was clarified by an amendment to the RFP. Discussion among the selection board members also resulted in a conclusion that the contingency rate could be reduced from five percent to three percent which would have the result of increasing the programmed amount from $29 million to $29,600,000.

As issued, effective October 31, 1985, Amendment No. 0008 to RFP N62745–85–R–0038 provided, in pertinent part:

1. Page 1–1, paragraph 1A.4, third line, delete: $29,000,000" and insert; "$29,-600,000".

&ast; &ast; &ast; &ast; &ast; &ast;

Note: Given present funding and appropriation climate it is highly unlikely, if not impossible, that additional funds above the programmed award amount would be made available. All proposals should therefore be reevaluated and, as much as possible, be brought into compliance with the programmed award amount. Therefore, the following amendment item is provided:

3. Page 1–2, paragraph 1A.4b, Amendment No. 0003, delete paragraph and insert; "It is the Navy's intention to award a full criteria project, complete with 460 units and accompaning [sic] site improvements, within programed award amount ($29,600,000 USD)."

&ast; &ast; &ast; &ast; &ast; &ast;

By letters dated November 1, 1985 to all proposers, a fourth set of proposals was required by December 2, 1985.

Upon receipt of Amendment No. 0008 and the letter of November 1, 1985 requesting best and final offers, the firm eventually receiving the Navy's award recommendation sent a telex to the Navy officer in charge of this construction. The telex stated that Amendment No. 0008 to the RFP was apparently issued for the purpose of asking "all offerors for completely new proposals, including new prices, terms and supply." Concern was also expressed that the "Navy is asking us solely for an outright price reduction" and that the "contract might be awarded as the result of a virtual auction."

In response to this telex, the contracting officer sent a telex to the firm stating that the reason for Amendment No. 0008 was not to award the contract by "virtual auction" but was

to indicate the maximum funds presently available to the Navy for award of the contract &ast; &ast; &ast;. [U]nlike some previous military family housing projects, funds available for award above the programmed award amount are extremely scarce. Thus, amendment no. 8 apprises all proposers of the funding situation for this project so that it can be accounted for in their bidding strategy.

The contracting officer also stated that the

Navy is not now seeking a new proposal nor is it asking solely for an outright price reduction. In responding to amendment no. 8, all proposers have the option of adding, eliminating or changing features which exceed the minimum criteria. For example, a proposal with more than the minimum number of tot-lots provided might change his drawings to show those above minimum requirements as suggested space for future construction and reduce his price accordingly. Obviously, this will result in some reduction in quality points awarded. Others might choose to add amenities to improve their total quality points with a possible increase in price &ast; &ast; &ast;. Navy policy, unlike other

services, precludes a meeting with you to, as you say, consider options. You must adjust your proposal as you believe necessary in light of amendment no. 8.

On November 26, 1985 the Navy project manager received a telephone call from an official of one of the firms submitting proposals. The Navy project manager was informed that the Italian partner of this firm had reported a rumor concerning the technical scores for the top three October proposals. This was confidential information not to be disclosed to proposers. No firm names were given, but relatively accurate scores were recited for the three highest ranked October proposals using identification numbers assigned for use during the evaluation process. The number recited for the second-ranked proposer was inaccurate, but was close to the correct number. The official calling the Navy could not explain how his Italian partner had received this information. While the situation was discussed within the Navy as a matter of some concern, essentially no action was taken to investigate the source of this release of confidential information. The Navy personnel concluded that without corresponding price information, a proposer could not ascertain overall rankings. Because revised proposals would shortly be submitted which could render prior scoring obsolete, it was determined that the selection process should continue. The record contains no evidence that any firm, other than the one whose United States partner notified the Navy, received such confidential technical score information. This firm's final proposal was, for other reasons, not ranked such as to be in the running for the award.

Upon receipt of the December 2, 1985 best and final proposals, six of the nine were scored. One proposal not scored was determined to be nonresponsive (unacceptable) as costs were submitted in dollars and lire whereas the specifications required dollars only. Two other proposals not scored were determined to be nonresponsive (unacceptable) as the cost proposal exceeded the programmed award amount. One other proposal, although scored, was determined to be still technically nonconforming. Excluding the one technically nonconforming proposal, of the five remaining, plaintiff's proposal ranked third. The selection board recommended an award to the firm ranking first. In submitting its December 2, 1985 proposal, the top-ranked firm reduced its price to meet the programmed amount, removing certain amenities, such as skylights and glass shower doors, as compared to its previous proposal. The top-ranked firm's December proposal also provided kitchen cabinets that are 12" deep notwithstanding the specification requirement that "Minimum depth of wall cabinets is 15 in. (37.5 cm)." These changes served to reduce slightly its technical points as compared to the October proposal. Plaintiff's technical points remained unchanged in both proposals. The relative ranking between plaintiff and the higher-ranked firms remained the same in the October and December proposals.

On January 8, 1986, after the concluding round of best and final offers had been submitted, Caddell Construction Co., Inc./ISE Construzioni, S.p.A., a Joint Venture (Caddell), another offeror that had submitted a proposal in response to the RFP, filed a complaint for declaratory and injunctive relief and application for a preliminary injunction in this court. Plaintiff's motion for intervention pursuant to RUSCC 24(a) was granted on February 6, 1986. Caddell's complaint was dismissed by an opinion filed March 7, 1986.

### Discussion

Plaintiff raises three main arguments, an alternative three-pronged argument and one final argument in support of its position in this matter. To summarize, plaintiff argues that defendant failed to make a competitive range determination, in violation of 10 U.S.C. § 2304(g), § 2305(b)(4), and 48 C.F.R. § 15.609; that the December 2, 1985 round of best and final offers constituted technical leveling, in violation of 48 C.F.R. § 15.610(d)(1); and that the December 2 round constituted an illegal auction,

in violation of 48 C.F.R. § 15.610(d)(3). Plaintiff argues, alternatively, that if the government's request for the December 2 round was not in contravention of applicable procurement statutes and regulations, that the contract would be improperly awarded to the recommended firm because (i) illegal discussions took place between defendant and this firm, in violation of 48 C.F.R. § 15.610(b); (ii) the top-ranked firm's proposal was nonconforming to the terms of the RFP and in violation of NAVFAC Instruction 11101.85; and (iii) this firm is not legally a joint venture as contemplated by the terms of the RFP. Finally, plaintiff argues that a disclosure of procurement information occurred which had the effect of violating the integrity of the procurement process thereafter.

Plaintiff seeks to have this court restore the procurement to the status of October 7, 1985, thereby placing Kellogg again in the position of being the only technically conforming offeror within the dollar limitations placed on the procurement.

Defendant argues that plaintiff has waived any right to object to the government's decision to request the final round of best and final offers. Defendant denies that it participated in any illegal conduct relating to this procurement, including violation of applicable procurement statutes and regulations. Finally, the defendant argues plaintiff has failed to establish that disclosure of confidential procurement information has impacted on the procurement and urges that plaintiff has requested relief this court cannot grant.

In resolving the issues presented, it is recognized that deference must be afforded to an agency's pre-award procurement decisions if they have a rational basis and do not violate applicable law or regulations. Care must particularly be taken in this regard when the procurement involves national security or national defense interests. *See Electro-Methods, Inc. v. United States*, 7 Cl.Ct. 755 (1985); *Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229 (1983); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

*Competitive Range*

Plaintiff asserts that the government has not acted in compliance with applicable law in holding the December 2, 1985 round of best and final offers. Plaintiff has specifically alleged, *inter alia*, that defendant failed to make competitive range determinations, as required by 10 U.S.C. § 2304(g) and 48 C.F.R. § 15.609. Title 10 U.S.C. § 2304(g) provides that the government must conduct discussions with offerors within a competitive range. Federal acquisition regulations, at 48 C.F.R. § 15.-609, provide:

(a) The contracting officer shall determine which proposals are in the competitive range for the purpose of conducting written or oral discussion. * * * The competitive range shall be determined on the basis of cost or price and other factors that were stated in the solicitation. * * *

While the record supports the contention that no express competitive range determination was made by the government, it is concluded that *de facto* competitive range determinations were made. It is well established that a proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless, *Harris Data Communications, Inc. v. United States, supra*, 2 Cl.Ct. at 240. Stated another way, a proposal will generally be considered to be within the competitive range until, as a result of written or oral discussions, it has been determined to no longer have a reasonable chance for being selected for award. *See, e.g., Falcon Systems, Inc.*, B–213661, June 22, 1984, 84–1 CPD ¶ 658 at 3.

The record presents no facts which would support a conclusion that any of the offerors should have been excluded from the competitive range at any relevant point during the evaluation process. In effect, the Navy's policy promoted maximum competition by including all offerors in the evaluation process. On these facts, an ex-

press or written competitive range determination need not be made since no offeror has been improperly excluded from, or included in, competition. *See, e.g., Merret Square, Inc.,* B–220526–2, sl. op. at 10, March 17, 1986.

*Auction*

Plaintiff argues that defendant's final request for best and final offers constitutes an illegal auction, in contravention of 48 C.F.R. § 15.610(d)(3). Kellogg alleges that the selection board reviewed the technical evaluation team's evaluation of the October round of best and final offers and found no technical reason to request an additional round. The selection board's concerns arose when the prices were uncovered. At this stage in the procurement, the eventually top-ranked proposer had submitted a price above the $29 million limitation. Kellogg concludes that the final round of best and final offers was motivated by favoritism, basing its assertion, *inter alia,* on the fact that an additional $600,000 was added to the procurement's cost limitation figure by Amendment No. 0008. Kellogg asserts that Amendment No. 0008 "telegraphed" a specific price and specific technical suggestions to all offerors, thereby providing any firm with a higher price an undeserved competitive advantage and ultimately constituting an illegal auction.

48 C.F.R. § 15.610(d)(3) provides that the government shall not engage in:

(3) Auction techniques, such as—

(i) indicating to an offeror a cost or price that it must meet to obtain further consideration; * * *.

Plaintiff cites 50 Comp.Gen. 222 (1970) for the general proposition that the Comptroller General has disapproved of government attempts to auction negotiated contracts. Clearly, similar prohibitions are placed on auction techniques by federal acquisition regulations.

The record does not show any facts which constitute prohibited auction techniques. Amendment No. 0008 established a ceiling price, communicated to all offerors. It did not telegraph a specific price to only one offeror or to less than all offerors.

Indicating a ceiling price or programmed award amount for a solicitation is not the type of activity prohibited by 48 C.F.R. § 15.610(d)(3)(i).

Moreover, the term "auction" connotes direct bidding of price between two competing offerors and not the negotiation of a price between an offeror and the government. *Washington School of Psychiatry,* B–192756, March 14, 1979, 79–1 CPD 178; 2 McBride & Wachtel, *Government Contracts* § 9.10[14] (1984). There is no auction when a contracting officer advises all offerors of the funds available for a procurement, because the relative standing of the offerors is not disclosed. *Id.* Amendment No. 0008 advised all offerors of the funds available for the Comiso procurement. No relative standing of any offeror was disclosed by the issuance of Amendment No. 0008. No prohibited conduct took place by revealing defendant's price goal. *See, e.g., Professional Review of Florida, Inc.,* B–215303.3–4, April 5, 1985, 85–1 CPD ¶ 394; *Indian Community Health Service, Inc.,* B–217481, May 15, 1985, 85–1 CPD ¶ 547. Given the fact that a majority of the October proposals exceeded the programmed amount, indicating a possible ambiguity in the specifications, the government had a rational basis to reaffirm the programmed award amount limitation. Similarly, the reduction of the risk factor with the corresponding addition of $600,000 to the programmed amount had a rational basis.

*Technical Leveling*

Plaintiff's next argument dovetails with its argument that defendant conducted an illegal auction. Plaintiff contends that in addition to conduct tantamount to an illegal auction, defendant engaged in prohibited technical leveling by requesting successive rounds of best and final offers. Plaintiff has specifically contended that the final round of best and final offers in conjunction with Amendment No. 0008 constitutes technical leveling to the advantage of the top-ranked firm and the second-ranked firm. In support of its argument plaintiff

cites several portions of the deposition testimony, admitted as record evidence, which, in summary, indicate that NAVFAC attempted, through successive best and final offers, to bring proposals into a "common equitable position" prior to selection of an awardee.

█ Technical leveling is the disclosure of "one proposer's innovative or ingenuous solution to a problem * * *." *Drexel Heritage Furnishings v. United States*, 7 Cl.Ct. 134 (1984), *citing*, B–173677, 51 Comp.Gen. 621, 622 (1972). Thus, "providing an offeror with information as to specific desired items or approaches to the detriment of another offeror who may have initially proposed such an item or an innovation or desired approach" is prohibited conduct. *Rockwell Intern. Corp. v. United States*, 4 Cl.Ct. 1 (1983).

█ Upon consideration of the record, it cannot be concluded that defendant's actions, in obtaining several best and final offers, were without a rational basis or that defendant conducted impermissible technical leveling. There is no evidence in the record which suggests that any one offeror, including the one top-ranked, was provided "with information as to specific desired items or approaches to the detriment of another offeror who may have initially proposed such an item or innovation or desired approach." *Rockwell Intern. Corp. v. United States, supra*, 4 Cl.Ct. at 3. To the contrary, the record shows that all technical discussions with offerors were designed to bring the proposals to the level of meeting the published specifications available to each offeror, or were held "to point out weaknesses, in a general sense, to an offeror's proposal, but without discussing proprietary or inventive items of *other* offerors." *Drexel Heritage Furnishings v. United States*, 7 Cl.Ct., *supra*, at 153.

### Illegal Discussion

█ Plaintiff has argued alternatively that if the final round of best and final offers was not in violation of applicable procurement laws, award of the contract to the top-ranked firm would be improper because illegal discussions were held between defendant and that firm. Plaintiff contends that discussions were held in violation of 48 C.F.R. § 15.610(b) which concerns the conduct of written or oral discussions between an agency and an offeror in negotiated procurements. Plaintiff asserts that because the government's response to this firm's telex regarding Amendment No. 0008 was not provided to other offerors, that the government failed to conduct discussions with all offerors in the competitive range. While it would have been preferable for the contracting officer to have responded to this telex in some way that would have furnished the response to all offerors, it is concluded that defendant's action did not constitute an illegal discussion.

█ The test for determining whether discussions have occurred is whether an offeror has been afforded the opportunity to revise or modify its proposal. 2 McBride & Wachtel, *Government Contracts* § 9.10[14] (1984). The government's responding telex did not offer this firm another opportunity to revise or modify its proposal in any way which differed from the opportunity provided to all offerors by Amendment No. 0008 and the November 1, 1985 letters. The sole purpose and effect of the government's telex was to clarify Amendment No. 0008. Mere clarification does not require discourse with the other offerors. *New Hampshire-Vermont Health Service*, 57 Comp.Gen. 347, B–189603, March 15, 1978, 78–1 CPD 202. Additionally, no technical suggestions were "telegraphed" by the government's telex. All offerors had the same information regarding deletion of amenities by reason of the RFP, paragraph 2C.8(h) which provides:

h. *Desired Items.* Any or all amenities indicated may be omitted in order to submit a proposal within the budget. However, proposers must recognize that evaluation quality points will be affected. These amenities are not to be provided on a selected basis among unit types (e.g., if carports are offered for a partic-

ular unit type, carports are to be provided for all units in the project.)

*Nonconformity*

 Kellogg has objected to any award of the Comiso housing contract to the top-ranked firm because it alleges that it has provided the government with a nonconforming proposal. Paragraph 2C.1b of the RFP requires offerors to supply kitchen cabinets with a depth of 15 inches. The top-ranked firm's final proposal provides for 12-inch kitchen cabinets. Plaintiff argues that an award on this proposal would violate NAVFAC Instruction 11101.85D which provides that "a proposal containing non-conformities *may* not be considered for selection." (Emphasis added.) Plaintiff cites a fundamental proposition that all offerors must be treated equally with respect to statements of agency requirements. However, the issue at hand cannot be viewed quite that simply. Plaintiff has cited Comptroller General cases which hold that a proposal which ultimately fails to conform to *material* terms of the solicitation should be considered unacceptable. The question is whether the provision for 12-inch versus 15-inch cabinets is a material difference or, in other words, is the 15-inch kitchen cabinet a material term? Where a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand. *See, e.g., Grade-Way Const. v. United States,* 7 Cl.Ct. 263 (1985). Although the procurement in *Grade-Way* was not a negotiated procurement, the same principles would be applicable in a negotiated turnkey procurement. It is not clear that any award to the top-ranked firm would modify the specifications to permit 12-inch cabinets. The applicable specifications require 15-inch cabinets. In any event, plaintiff has not shown that supplying 12-inch cabinets instead of 15-inch cabinets would have a material effect on price, quality, quantity or delivery of items to be supplied in this $29,600,000 procurement. In the judgment of the procurement officials concerned, 12-inch versus 15-inch kitchen cabinets would have a minimal effect on the overall project and

the record provides no basis on which this judgment can be refuted.

Moreover, the phraseology of NAVFAC Instruction 22202.85D is permissive. It states that a proposal containing nonconformities "may" not be considered for selection. It is a basic tenet of construction that if the provision was intended to be mandatory, the term "shall" would have been used in place of the word "may." Sutherland, *Statutory Construction* § 57.-03 (4th ed).

*Joint Venture*

 Kellogg contends that the government cannot properly award to the top-ranked firm because the United States portion of the joint venture is a wholly-owned subsidiary of its Italian-firm partner. Plaintiff asserts that this arrangement does not constitute a true joint venture as contemplated by the RFP. Although Kellogg has cited case law defining a joint venture, it has presented virtually no evidence in support of its allegation that the top-ranked firm does not conform to the RFP requirement. On its face, the arrangement meets all the specific RFP requirements in this respect. As such, this argument must be dismissed as unsupported by any evidence of record.

*Disclosure*

 The record demonstrates that some disclosure of confidential information occurred.

Fundamental to an ultimate conclusion regarding this disclosure matter is the question whether the integrity of the procurement process was actually compromised. The record would not support a conclusion that such compromise occurred. The government's procurement officials determined that a proposer could not discern overall rankings based on dollar to quality point ratios without information about proposal prices. In addition, the disclosed information may have been rendered obsolete by changes submitted in the final round of best and final offers by any one of the nine

offerors. No evidence was presented which demonstrated the disclosure to have had any impact on the relative rankings of the significant offerors. In fact, the relative rankings of these firms remained unchanged. Accordingly, the Navy's decision to proceed with the December evaluations has a rational basis.

*Waiver*

Defendant argues that plaintiff has waived its right to object to a December 2, 1985 round of best and final offers. It is contended that since plaintiff willingly participated in the December 2 round of proposals, it may not now argue that these proposals should be disregarded. In support of this argument, defendant relies on *Airco, Inc. v. Energy Research & Development Administration,* 528 F.2d 1294, 1300 (7th Cir.1975), and *Ling-Temco-Vought, Inc. v. United States,* 475 F.2d 630, 201 Ct.Cl. 135 (1973). As it has already been concluded that no valid reason exists to overturn the Navy's action in proceeding with the December 2, 1985 proposals, this "waiver" argument need not be addressed. Only if plaintiff had established some infirmity with respect to the December 2, 1985 evaluations would it be necessary to consider whether it had waived any right to address the particular infirmity involved by voluntarily participating in the process.

*Conclusion*

Throughout the pendency of the instant action, plaintiff has sought relief that would cause the Comiso housing contract to be awarded to Kellogg. Based on the foregoing discussion, it is concluded that the Navy's procurement actions must be upheld and that no valid basis has been established to justify the relief sought.[3]

Accordingly, it is ORDERED that final judgment shall be entered dismissing plaintiff's complaint with each party to bear its own costs.

---

3. As this determination also necessarily precludes the recovery of proposal preparation

costs, no reason exists for any further proceedings in this regard.