**PLANNING RESEARCH CORPORATION,**
Appellant,

v.

**The UNITED STATES, Appellee,**

and

**Electronic Data Systems Federal Corporation, Intervenor.**

No. 89–1562.

United States Court of Appeals, Federal Circuit.

Aug. 5, 1992.

Herbert L. Fenster, McKenna, Conner & Cuneo, of Washington, D.C., argued for appellant. With him on the brief were Lawrence M. Farrell and Susan F. Heck.

John S. Groat, Attorney, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief were Thomas West and Prentis Cook, Dept. of Energy, of counsel. Ronald K. Henry, Baker & Botts, of Washington, D.C., argued for intervenor. With him on the brief was Stephen L. Teichler.

Before NIES, Chief Judge, ARCHER, Circuit Judge, and KELLEHER, District Judge.[1]

ARCHER, Circuit Judge.

Planning Research Corporation (PRC) appeals the decision of the General Services Board of Contract Appeals (board) which sustained the protest filed by Electronic

1. Judge Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

2. In the board's findings, these solicitation requirements are set out as follows:

Data Systems Federal Corporation (EDS) to the contract awarded to PRC by the Energy Information Administration (EIA), United States Department of Energy, 89–2 BCA ¶ 21,655. EDS intervened and urges on appeal that the board's decision be affirmed. The United States has contested that part of the board's decision holding that PRC's contract should be terminated at no cost to the government. The board's decision terminating the contract is affirmed, but its determination that the contract termination should be at no cost to the government is vacated.

### I.

EIA solicited bids for the management and support of its Forrestal Computer Facility located in Washington, D.C. EDS was the incumbent contractor at the facility. The contract was for a term of two years, with three successive one-year renewal options. The total estimated cost was in excess of $34 million.

In the original Request for Proposal EIA informed bidders that:

The selected offeror must be able to provide a dedicated, stable, and technically qualified staff to maintain continuity in level of service.... Therefore, in order for the contractor to be successful the majority of the work must be performed by a qualified work force whose personnel remain relatively constant.... Work cannot be delayed in order to continuously train new contract personnel.

To evaluate each bidder's proposed staffing, EIA required the submission of a résumé for each of the nineteen "key" and eighty-two "non-key" personnel to be committed for the first year's staffing. The solicitation also required a statement defining the extent to which the corporation would commit the named key personnel to the contract.[2]

The solicitation required offerors to submit a resume for each of the 101 people proposed for the first year of the contract:
A. The qualifications of dedicated key personnel.
. . . .

PRC submitted its initial proposal to EIA containing the résumés of 101 people retrieved from a database of employee résumés maintained for bidding and other purposes. In its proposal, however, PRC disclosed that, if awarded the contract, it intended to hire and rely on incumbent EDS employees to staff the contract. The PRC proposal stated that "immediately upon contract award, PRC will obtain a roster of incumbent employees and begin recruiting efforts" and that it "estimate[d] that a high percentage of incumbent personnel at EIA will be available to join PRC." After the field of potential contractors was reduced to PRC and EDS, EIA asked the two corporations to respond to written and oral questions. Specifically, EIA questioned PRC's statement concerning the hiring of incumbent personnel and advised PRC that, if true, it would be considered a weakness in its proposal. Thereafter, PRC repeatedly assured EIA both orally and in writing that incumbent personnel would not be required and that the people named in its proposal would be the actual ones who would perform the contract. For example, in its written response to one of EIA's questions, PRC stated:

PRC will provide, as proposed, a full and complete staff for the EIA Forrestal Computer Facility from our current personnel resources. No incumbent personnel are required.

The revised PRC proposal also provided:

It should be noted that PRC's transition planning does not assume the retention of incumbent personnel. PRC has developed a superior project staff from our own current resources, the key people being members of our most senior staff. PRC has identified employees for all project positions.

. . . .

We do not anticipate recruiting new personnel to initially staff the EIA project.

Despite the repeated assurances regarding staffing, the board found that, with the exception of the project director and one or two other key personnel, PRC had not contacted the people who had been proposed, or their supervisors, to determine their availability to work on the EIA contract at the time of submitting its best and final offer (BAFO). Moreover, at about the time PRC's BAFO was submitted, a senior personnel manager sent a memorandum regarding the EIA contract to PRC's vice president in charge of the procurement stating that:

[b]ased upon assumptions that relatively few internal candidates will actually be assigned to the effort and few of the incumbents will join PRC, I am anticipating that we will have to hire in excess of 50 people over the next two months.

PRC's personnel office then began planning the recruiting effort for the EIA contract.

During the course of contract negotiations, the changes that PRC and EDS made in their proposed staffing received the close scrutiny of EIA. In the nine-month period between the submission of its initial offer and its BAFO, PRC made twelve substitutions. In every case, these substitutions were made only after PRC was ad-

---

2. Submit resumes for the persons to be proposed for the key positions [19 persons]. Each resume should not exceed four pages in length. Each should contain the names and current telephone numbers of at least three business-related references not associated with your company. If any Key Personnel positions are to be filled with subcontractor staff, the subcontractor as well as the key person must be identified.

3. Because the personnel proposed to fill the Key Personnel positions are considered critical to this procurement, the offeror shall provide a statement defining the extent of corporate commitment to the dedication of each person.

. . . .

B. The qualifications of dedicated, non-key personnel

The offeror shall propose named individuals for each required non-key position.

1. Resumes are to be provided for proposed non-key personnel. The resume shall demonstrate the satisfaction of the General Position Description special knowledge, training, and skills of the position for which the individual is proposed. Each resume should not exceed two pages in length and shall not include references.

2. If the offeror proposes any non-key personnel who are not currently employed by the offeror or proposed subcontractor, a commitment letter should be furnished with the resume.

vised by government representatives that its selected people appeared to be overqualified or underqualified for the position involved or no longer worked for PRC.

EDS, on the other hand, made numerous substitutions to its proposed staffing for various reasons. EDS stated at the time of submitting its BAFO that the information on the changes in proposed staffing was to "make sure that they reflected the exact situation at the time of submission." EIA viewed EDS's substitutions to be "turnover" and considered it a weakness in evaluating EDS's proposal. The board found that EIA "downgrade[d] EDS for its forthright revisions in staffing." As a result, PRC was awarded the contract.

After contract award, PRC's project director asked EIA's contract supervisor (who had also served as chairman of the EIA source evaluation board that reviewed PRC's and EDS's BAFOs) if there were incumbent EDS personnel he would like to see hired by PRC. The names of four or five incumbent employees were provided, as well as the home telephone numbers of all incumbent employees of EDS and its subsidiary. With EIA's approval, PRC then discussed employment or offered positions to all of EDS's (and its subsidiary's) personnel at the Forrestal Computer Facility. In the same time frame, PRC ran an advertisement in *The Washington Post* for an open house at which it recruited for the EIA contract.

The board found that PRC's substitutions of personnel to staff the contract were extensive. At the time the board issued its order suspending the contract, seventy-four people had been "identified" to work on the EIA contract. PRC had hired twenty-four of these people from EDS or its subsidiary and had five offers outstanding. Twelve were hired from other sources. Three positions were filled by PRC employees who were not among those proposed. For the key positions, PRC had replaced three employees and was seeking replacements for four others. Based on these findings of the board, forty-two of the seventy-four employees for the EIA

contract were not the ones proposed by PRC in its BAFO.

EDS filed a protest with the board challenging the award of the contract to PRC and the board suspended EIA's procurement pending the resolution of the protest. In its decision on the protest, the board found that (1) PRC offered the services of employees it never intended to provide, (2) EIA ignored evidence that should have made it aware of PRC's misrepresentations, and (3) immediately after the award, EIA permitted and assisted PRC in making massive substitutions for the proposed personnel. The board stated:

> Notwithstanding its specific statements to the contrary, PRC never intended to provide the services of the 101 specific people named in its proposal.
>
> . . . .
>
> EIA . . . at a minimum ignored evidence that should have put it on notice of PRC's intended "bait and switch." Moreover, after requiring the offerors to propose the services of specific personnel to work on the contract, and evaluating the proposals on the basis of their qualifications, EIA turned right around and gave PRC the home telephone numbers of all of the incumbent EDS personnel and permitted PRC to hire as many of them as it could to work on the contract. Full and open competition was not achieved because EIA in essence materially modified, after contract award, the contract requirements upon which the competition was based.

In its reconsideration decision, the board reaffirmed its holding that PRC misrepresented the personnel to be used on the contract and again noted the government's assistance to PRC in substituting personnel by stating that:

> immediately after award, the Government permitted (and even helped) PRC to make massive substitutions of personnel which, in essence, invalidated the evaluation process under which PRC won the contract.

The board's decision directed EIA to terminate the contract at no cost to the government.

## II.

This appeal is brought pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1988). The board's findings of fact are final unless they are found to be arbitrary, capricious, based upon less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1988); *American Elec. Lab., Inc. v. United States*, 774 F.2d 1110, 1112 (Fed.Cir.1985). The decision of the board on any question of law, however, is not final or conclusive and is reviewable *de novo* by this court. *Id.* Legal interpretations by tribunals having expertise are helpful, even though not compelling. *United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed.Cir.1987).

A. PRC contends that its post-award substitution of personnel to perform the EIA contract was a matter of contract administration and was not properly reviewable by the board in a bid protest action. It relies on prior Comptroller General decisions which denied protests based on allegations of improperly substituted personnel after award. While those decisions are not binding authority, they may nevertheless be considered because of the Comptroller General's experience in dealing with bid protests. *See id.* We are not persuaded, however, by PRC's argument. The facts involved in this procurement differ significantly from those in the cited Comptroller General decisions.

PRC first cites *Applications Research Co.*, Comp.Gen. B–230097, 88–1 CPD ¶ 499 (1988) which it describes as "a case factually on point with the instant case." We view this case as factually distinguishable and not supportive of PRC's position. In *Applications Research,* the procurement was for data technician services requiring 20 individuals with one to three years of experience. The successful bidder, INS, stated in its proposal that it would "strive to hire as many of the incumbent's high quality personnel as possible." The agency's evaluators considered this recruitment plan as a strong point in the INS proposal. The decision also notes that the agency neither encouraged nor required INS to hire incumbent personnel. INS ultimately hired former agency personnel for the bulk of the workforce used to perform the contract. Under these circumstances, the Comptroller General determined that INS's personnel changes were not improper and denied the bid protest. Similarly, in *A.B. Dick Co.*, Comp.Gen. B–233142, 89–1 CPD ¶ 106 (1989), another decision cited by PRC as analogous to the instant case, the offeror "indicated in its proposal that it would consider hiring 'qualified candidates from the incumbent's staff to supplement its operational staff.'" Upon securing award of the contract, the offeror proceeded to hire eight employees from the incumbent's staff and substitute them for personnel originally proposed. A bid protest based on these personnel changes was dismissed. The Comptroller General determined that as a general rule, the substitution of personnel after award of a contract falls within the responsibility and discretion of the agency's contracting officer, *see* 4 C.F.R. § 21.-3(m)(1), and does not constitute grounds for a bid protest.

The board in this case determined that the personnel substitution clause of the contract could not be used to justify major modifications to the procurement that was bid. It said that the clause is "intended to permit the natural turnover of personnel that tends to occur during performance of a contract [and is not intended to be] a license for the contractor to implement a new proposal immediately following the award." We agree because the facts here are not comparable to those in the decisions cited by PRC.

After initially indicating that it would recruit heavily from the incumbent's work force, PRC expressly changed its plan when it found that the agency considered this a weakness. PRC repeatedly represented and assured EIA that it would staff the contract with the personnel for whom résumés had been provided. The board found this was a misrepresentation by PRC because it did not have that intent. In the board's words, there was an "intended 'bait and switch'" by PRC. We are convinced, as was the board, that the misrepresentations of PRC, together with the "massive"

personnel substitutions made by PRC after award with the acquiescence and assistance of EIA, tainted the bidding and evaluation process.

More pertinent to the instant case, therefore, is the Comptroller General's decision in *Ultra Technology Corp.*, Comp.Gen. B–230309.6, 89–1 CPD ¶ 742 (1989), where each offeror was required to submit résumés of the key personnel that were proposed for the contract. After award, none of the key personnel proposed by the successful bidder was used on the contract. The successful bidder gave a number of purported reasons for the changes. The protestor, however, was able to show that in some cases the proffered reasons were false. For example, one of the proposed key employees did not authorize his name to be submitted in connection with the offer, while another was never offered the designated position. The Comptroller General then recommended that the agency terminate the contract absent a satisfactory explanation for the change of personnel.

Similar allegations that an offeror had misrepresented the availability of personnel were involved in *In re Informatics, Inc.*, B–188566, 57 Comp.Gen. 217 (1978), where the Comptroller General stated:

> [W]e believe that the submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal. The integrity of the system demands no less. Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

*Id.* at 225.

Because full and open competition in the bidding and award of the contract was not achieved, the board properly considered and decided the bid protest of EDS. *See* 48 C.F.R. § 6.000 (1991) ("This part prescribes policies and procedures to promote full and open competition in the acquisition process …").

B. We turn then to the questions of whether the board erred in finding PRC misrepresented the personnel it would use to perform the contract and in finding that EIA permitted and encouraged material modifications in the personnel actually used to perform the contract, contrary to the requirements of the bidding and evaluation process. PRC states that the board's holding that PRC engaged in a "bait and switch" was "arbitrary, capricious, grossly erroneous, not supported by substantial evidence or not in accordance with applicable law." PRC's position boils down to a contention that the record does not establish that PRC *intended* to change its proposed staffing at the time it submitted its proposal. PRC asserts that the board relied primarily on the memorandum from a senior manager in PRC's personnel office to support its finding. It urges that the credibility of its live witnesses was greater than the statements in this memorandum. Finally, it argues that the post-award conduct in using people on the contract other than those designated was merely an attempt to accommodate EIA in providing a shorter phase-in during the Christmas holiday season.

These arguments are not persuasive. The board's findings are supported by substantial evidence and its credibility determinations are virtually unassailable. *See Hambsch v. Department of the Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986). Based on these findings, the board properly could reach the conclusion that PRC misrepresented the personnel who would perform the contract and intended to alter its staffing after award.

The identity of the individuals proposed for contract performance was a critical factor in the evaluation process and PRC was fully aware of this. The solicitation expressly so stated:

> Because the personnel proposed to fill the Key Personnel positions are considered critical to this procurement, the offeror shall provide a statement defining the extent of the corporate commitment to the dedication of each person.

742

The solicitation also indicated that the entire work force not only had to be highly qualified, but also dedicated, stable, and relatively constant so that work would not be delayed for training new personnel.

It was not, as PRC contends, just the memorandum of PRC's personnel manager regarding staffing for the EIA contract that caused the board to conclude that PRC misrepresented its intentions. The board also relied on other findings in reaching this conclusion. It found that when PRC submitted its original proposals, the employee résumés were taken from a database, and submitted without ascertaining whether any of the people would be available to work on the EIA contract, which was contrary to the normal practice and policy of PRC. The board discounted PRC's testimony that the vice presidents and supervisors within PRC were contacted to inform them that personnel in their departments had been proposed for the EIA contract because it found that PRC "provided only one undated letter to one vice president concerning 5 of the 101 proposed employees" and that "no responses were received to any letters" that may have been sent regarding the availability of the 101 employees. According to the board at the time of submitting its BAFO, PRC "still had not contacted the people who had been proposed, or their supervisors, to determine their availability to work on the EIA contract."

When EIA advised PRC that its intent to hire incumbents would be considered a weakness in its proposal, PRC repeatedly assured EIA that the individuals named in its proposals would be the ones performing the work. Similarly, PRC did not indicate during the course of the negotiations that there would be any changes in the proposed staffing of the contract unless a specific individual was questioned by EIA as being underqualified, overqualified, or unavailable for the proposed position. Only then would PRC designate a replacement.

In discerning PRC's intent, the board also relied on its post-award conduct, which included offering employment, with EIA's approval, to substantially all of the incumbent personnel, holding an open house to recruit incumbent personnel for the EIA contract, and conducting the open house for other potential employees by advertising it in the newspaper.

PRC argues that the board erroneously relied on this post-award activity to ascertain pre-award intent. According to PRC, these changes occurred because the award was made during the Christmas season and the phase-in period was shortened from 60 days to approximately 30 days. The board considered these explanations but found they were not credible. It found instead that PRC "never even attempted, or intended, to provide the proposed personnel." The board concluded that PRC's post-award activities were merely an attempt to carry out the staffing plan described in its original proposal, which PRC repeatedly assured EIA had been abandoned.

This court has held that intent frequently must be proved by circumstantial evidence. See Klein v. Peterson, 866 F.2d 412, 415 (Fed.Cir.1989). Based on all the facts and circumstances, the board inferred that PRC never intended to produce the 101 people proposed for the EIA contract. It was within the board's function after observing witnesses and evaluating their testimony to assess PRC's explanations of the substitutions and to reject PRC's explanation of intent. We are persuaded that the board's findings are supported by substantial evidence and therefore discern no error.

In deciding that full and open competition in this procurement had not been achieved, the board further concluded that EIA, in essence, modified the contract requirement upon which the competition was based and undermined the assumptions of the bid evaluation process.

In reaching this conclusion the board relied primarily on the fact that EIA downgraded EDS's proposal for its "forthright revisions" to its proposed staffing that were made while the bid negotiations were being conducted, and then, immediately after award of the contract to PRC, permitted PRC to discard its proposed personnel

and to hire as many of the incumbent personnel as it could.

EIA's actions were not merely a response to PRC's requests under the personnel substitution clause contained in the contract. EIA encouraged the immediate substitution of incumbent personnel and gave PRC the home telephone numbers of all such personnel. The EIA employee who had chaired the source evaluation board, which evaluated the bid proposals, was the same person who instructed that the home telephone numbers be given to PRC.

As a result of these actions by EIA, PRC was able to offer employment to all of the incumbent personnel. At the time the contract was suspended, the board's findings indicate that well over one-half of 74 people who had been identified by PRC to work on the contract had been replaced and that a large part of the replacements came from the incumbent personnel.

We agree that the agency's post-award conduct, which was wholly inconsistent with its criteria for evaluating the bid proposals, contributed to the failure of this procurement to achieve full and open competition. As stated by the board, "EIA's actions after award completed the circle of uncompetitiveness." Accordingly, we affirm the decision of the board as being fully supported by the misrepresentations of PRC in the bidding process and by the modification of the contract permitted and encouraged by EIA after award.

### III.

■ While we agree with the board's conclusion to uphold EDS's protest, it went beyond its protest jurisdiction in ordering the contract terminated at no cost to the government. In a protest, the board has jurisdiction to determine the legality of an award of the contract, but not to settle all claims which may arise between the terminated contractor and the government. As this court said in *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed.Cir.1986):

> *GSBCA* has authority under the [protest] statute to determine whether a contract award violates a statute or regulation and to modify, revoke or suspend procurement authority. It *does not sit to settle the rights of a terminated contractor vis-a-vis the government, a matter not litigated in the protest nor within its protest jurisdiction.* Such matters must be resolved in the traditional forums for their resolution....

*Id.* at 395; *see also* 40 U.S.C. § 759(h)(5)(B) (1988), as amended. The basis for termination and the rights of PRC against the government or vice versa are not issues in EDS's protest. Because the board lacked protest jurisdiction to direct that the contract be terminated at no cost to the government in this case, we vacate this holding.

Each party shall bear its own costs.

AFFIRMED IN PART and VACATED IN PART.