## ORION INTERNATIONAL
## TECHNOLOGIES,
### Plaintiff,

### v.

### The UNITED STATES, Defendant,

### and

### Fiore Industries, Inc., Intervenor.

### No. 04–250C.

United States Court of Federal Claims.

Filed under seal June 30, 2005.

Reissued July 12, 2005 [1].

Kenneth A. Martin, Martin & Associates, PLLC, McLean, Virginia, for Plaintiff.

Douglas K. Mickle, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director, all of Washington, D.C., for Defendant. Capt. Charles Bucknor, Department of the Army, Arlington, Virginia, of Counsel.

Carolyn Callaway, Carolyn Callaway, P.C., Albuquerque, New Mexico, for Intervenor.

1. The parties were given an opportunity to propose redactions, and agree that no redactions are necessary. The opinion is now released to be published in its original form.

## OPINION AND ORDER

WOLSKI, Judge.

This post-award bid protest concerns the ability of a non-incumbent bidder to include in its proposal the name of an employee of the incumbent for a key position. The incumbent, Orion International Technologies ("Orion"), the plaintiff here, required its employees to sign no-compete agreements, pledging not to offer assistance to other bidders. One employee had already discussed the prospect of a position with another bidder, Fiore Industries, Inc. ("Fiore"), which ultimately was awarded the contract and has intervened in this matter. Before the no-compete agreement was signed, Fiore had submitted a written proposal containing the employee's résumé. After learning of the no-compete agreement, Fiore still identified the employee, during its oral presentation, as a person it intended to hire for a key position. Orion objects to the award, arguing that Fiore misrepresented its capabilities by including this individual, and submitted a non-responsive proposal by failing to truthfully propose someone for this key slot. But the record shows that Fiore accurately represented its intentions to hire the individual, and that his absence from participation in Fiore's oral presentation was immaterial and certainly excusable under the circumstances. Accordingly, for the reasons that follow, the Court DENIES the plaintiff's motion for injunctive relief and GRANTS the government's motion for judgment on the administrative record.

## I. BACKGROUND

### A. The Solicitation

In August of 2003, the Army Contracting Agency ("ACA") issued Solicitation No. DABK39–03–R–0013 and invited bids for a contract to manage the Center for Counter Measures ("CCM") at the White Sands Missile Range, located in the Tularosa Basin of south-central New Mexico, about forty-five

miles north of El Paso. *See* http://www.wsmr.army.mil/bd/where.html (last visited June 29, 2005); Administrative Record ("Admin.R.") at 1, 8. The successful bidder was expected to provide "research, engineering and analysis support to perform countermeasures/counter-countermeasures (CM/CCM) test and analysis activities on all precision-guided weapon systems, subsystems and related components." *Id.* at 73. The bids were graded according to a color system, with purple representing the highest grade, followed by green, blue and yellow, the lowest. *Id.* at 60, 77. The winning bid would represent the best overall value to the government. *See id.* at 59.

Four bids were submitted, but one bidder was rejected as unqualified and another withdrew from bidding prior to the oral presentations. *Id.* at 77. Thus, the two remaining bidders were Orion and Fiore. The ACA evaluated the bids according to three factors, the most important of which for present purposes was the "technical/management area" criterion. *See id.* at 76. This factor was divided into four sub-factors: overall mission understanding; proposed management plan; quality assurance; and tasks. *Id.* at 60. The bids were also graded under past performance and price factors. *Id.* at 61, 78. According to the solicitation, bidders were required to make an oral presentation of their proposal before a panel of evaluators, *id.* at 56 (Solicitation § L.1.4), addressing the sub-factors comprising the technical/management area criterion. The presentation team could not exceed six persons, one of whom was to be the proposed site manager ("PM"[2]). *Id.* (Solicitation § L.1.4(b)). Additionally, the bidders had to compose and submit a list of "key personnel . . . considered to be critical to the successful performance of this contract." *Id.* at 45 (Solicitation § H.6(b)).

The government's evaluators gave Orion the following ratings: green for mission understanding; blue for management plan; blue for quality assurance; green for task analysis service; green for task war fighter;

---

**2.** The Solicitation identifies this position as the "Project Manager." *See* Admin. R. at 196 (Solicitation § C.1.5.1). The parties also refer to this position as "Program Manager." *See* Admin. R. at 961 (Orion identifying Mr. Edward J.

Brady as "Program Manager"); Admin. R. at 783 (Fiore identifying Mr. Harold H. Zucconi as "Program Manager/Chief Engineer"). Hence, the acronym "PM" is used.

and low risk for past performance. Orion's price was approximately $35.5 million. Fiore received the following ratings on its proposal: purple for mission understanding; purple for management plan; purple for quality assurance; green for task analysis service; green for task war fighter; and low risk for past performance. Fiore's price was approximately $33.7 million. *Id.* at 12. Based upon the foregoing, on October 28, 2003, the Source Selection Authority determined that Fiore represented the best value to the government, *id.* at 12, and the Contracting Officer approved the award to Fiore, *id.* at 81. *See also id.* at 3. Fiore was notified on November 5, 2003, and Orion was debriefed by the government the next day. *Id.*

### B. The Zucconi–Sanchez Contacts

The present dispute focuses upon Fiore's oral proposal presenting its bid and the personnel it offered to use if it were awarded the contract. Mr. Felix Sanchez, president of Fiore, in anticipation of his company's bidding on the White Sands contract, sought to line up a first-rate team of personnel, and believed that such a team would be helped by the presence of Mr. Harold Zucconi, an employee of the incumbent Orion. Mister Sanchez contacted Mr. Zucconi three times about employment. Zucconi Interrogatory[3] ("Zucconi") ¶ 1. The first contact was by telephone in late June or early July of 2003. *Id.;* Sanchez Interrogatory ("Sanchez") ¶ 4. During that telephone call, Mr. Sanchez asked Mr. Zucconi if he "would be interested in working for Fiore if it was awarded the follow-on contract for analysis at the Center for Countermeasures (CCM)." Zucconi ¶ 1; *see* Sanchez ¶ 4. Mister Zucconi stated that he would be interested in working for Fiore, but that he wanted to discuss issues relating to pay and authority, and to negotiate a written employment contract that would secure his position even in the event that Mr. Sanchez were to leave Fiore. Zucconi ¶ 1; Sanchez ¶ 4 ("During that call he told me

that he was definitely interested in employment if Fiore won the contract."). Mister Sanchez and Mr. Zucconi agreed to meet shortly after the initial telephone call. Zucconi ¶ 1; Sanchez ¶ 4 (stating that he called a second time to arrange for the face-to-face meeting "in mid-July").

The second contact was the face-to-face meeting that Mr. Sanchez and Mr. Zucconi agreed to during their telephone conversation. Zucconi ¶ 1; Sanchez ¶ 6 (meeting occurred on July 17, 2003). Mister Sanchez "prefaced the meeting by saying that he did not want to discuss anything about Orion or CCM." Zucconi ¶ 1; Sanchez ¶ 4 ("I told him at the beginning of the meeting that I did NOT want him to tell me anything about Orion's plans or activities, either past, present, or future."). The meeting lasted between one and two hours and covered Mr. Zucconi's expectations regarding pay, benefits and authority. Zucconi ¶ 1; Sanchez ¶ 4. Mister Zucconi suggested that his compensation be commensurate with a GS–14, step 10. Zucconi ¶ 4; *see* Sanchez ¶ 4. At the conclusion of the meeting, Mr. Sanchez said, "[w]e can probably work with that," and Mr. Zucconi felt that they "had established an informal agreement that if Fiore won the contract that [he] would go to work for them, and that Fiore would meet [his] requirements in an employment contract." Zucconi ¶ 1; *see* Sanchez ¶ 4. According to Mr. Sanchez, "Mr. Zucconi verbally agreed that if Fiore were awarded the contract, he would accept the position of Project Manager/Chief Engineer." Sanchez ¶ 4.

Sometime after this conversation, Mr. Zucconi sent his résumé to Fiore in response to a blind advertisement in either the *Albuquerque Journal* or *Las Cruces Sun–News.* Zucconi ¶ 10. Around August 6, 2003, Mr. Sanchez called Mr. Zucconi to inform him that Fiore had run the blind advertisement and would still be interested in hiring him if

---

**3.** The Zucconi Interrogatory Answers can be found as Exhibit One to the Plaintiff's Supplemental Memorandum. The Sanchez Interrogatory Answers can be found as Exhibit Two to the same. The Court, in its April 7, 2004 order, allowed the plaintiff to supplement the administrative record with answers to interrogatories

made to Messrs. Zucconi and Sanchez. *Orion Int'l Tech. v. United States,* 60 Fed.Cl. 338 (2004). The Court granted the supplementation request because of the plaintiff's allegations of fraud on the part of Fiore in connection with the latter's bid. *See id.* at 344–46.

Fiore were to win the contract. Sanchez ¶ 12. Fiore submitted its qualifications package to the government on or about August 27, 2003, prior to the due date of September 2, 2003. Sanchez ¶ 13. On September 3, 2003, Mr. Zucconi was told by Orion's on-site manager that he had to sign a no-compete agreement to keep his job. Mister Zucconi then submitted his resignation from Orion, but was talked out of it and instead signed the no-compete agreement. *Id.;* Zucconi ¶ 11. That evening, Mr. Zucconi called Mr. Sanchez to inform him that he was bound by the no-compete agreement, which prevented him from working on anyone else's proposal or allowing other bidders to use his résumé in their proposals. *Id.;* Sanchez ¶ 13. Mister Sanchez acknowledged this, and asked Mr. Zucconi whether he would still be willing to go to work for Fiore if they were to win the contract. Zucconi ¶ 11; Sanchez ¶ 13. Mister Zucconi stated that he would. *Id.;* Zucconi ¶ 11.

Mister Zucconi did not assist Fiore in the preparation of its bid, nor was he asked to assist. *Id.; see also id.* ¶¶ 1, 16. But prior to his signing the no-compete agreement, Mr. Zucconi had no objection to Fiore's use of his résumé. *Id.* ¶ 17. Mister Zucconi never provided a copy of the no-compete agreement to Fiore, *id.* ¶ 20(a); he was not aware that Fiore had proposed him as its On–Site Project Manager and Chief Engineer, *id.* ¶ 21; and he never gave Fiore permission to offer him as its proposed PM, *id.* ¶ 22(a).

The third contact between Mr. Zucconi and Mr. Sanchez occurred during a meeting held at White Sands in November, 2003, following the announcement that Fiore had won the contract. *Id.* ¶ 1. According to Mr. Sanchez, the meeting took place on or about November 12, 2003, and included, in addition to Messrs. Sanchez and Zucconi, Fiore's Chief Engineer and proposed Technical Writer/Office Manager. Sanchez ¶ 6. At the meeting, Mr. Sanchez confirmed the "previous oral offer." *Id.; see also* Zucconi ¶ 1 (stating "it was inferred they were going to make me an offer after the completion of the interviews with other employees were finished"). At that time, Mr. Sanchez anticipated that Mr. Zucconi's start date would be November 27,

2003, the first day of contract performance. *Id.*

Although Mr. Zucconi believed that Fiore was going to make him an offer after completing its interviews with other employees, no offer was made and he had no further communications with Fiore. Zucconi ¶ 1. The day after their November meeting, Fiore was informed of Orion's bid protest filed with the General Accounting Office, and Fiore was "advised by the contracting office not to have further discussions with the incumbents on-site until after the protest was resolved." Sanchez ¶ 6. Fiore then suspended its plan to send out written offers to its proposed workforce. *Id.* In January, 2004, Mr. Zucconi accepted a position with the government at White Sands superintending, among other things, the Fiore contract. *See* Zucconi ¶ 29.

### C. Procedural History

Orion filed a protest with the General Accounting Office ("GAO") on November 10, 2003. Admin. R. at 311. Fiore was notified three days later that work under the new contract was stayed pending resolution of the GAO protest. Sanchez ¶ 30. Orion's contract to perform services for CCM was extended to cover the protest period. *Id.* ¶ 31. The GAO denied Orion's protest on February 18, 2004. Admin. R. at 740. Fiore then resumed performance of the transition activities under the contract. Sanchez ¶ 31. Orion filed this post-award protest shortly thereafter. *See* Complaint. After a hearing, this Court denied Orion's motion for a Temporary Restraining Order. *See* Order (Feb. 27, 2004). Fiore began full contract performance on March 1, 2004. Sanchez ¶ 31.

## II. DISCUSSION

### A. Standard of Review

This Court has jurisdiction over post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, 110 Stat. 3870 (1996). The Tucker Act grants the Court jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or

proposals for a proposed contract or to a proposed award or the award of a contract . . . ." 28 U.S.C. § 1491(b)(1) (2000). In reviewing an agency's decision in a bid protest, this Court uses the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See Arch Chems., Inc. v. United States,* 64 Fed.Cl. 380, 384–85 (2005) (citing 28 U.S.C. § 1491(b)(4)). Thus, a protestor must show that the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Under the ADRA, the Court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

### B. *Whether Fiore Made a Material Misrepresentation in its Proposal*

█ The plaintiff contends that the contract award must be overturned because Fiore made a material misrepresentation concerning its qualifications in its oral proposal to the government. Specifically, the plaintiff argues that Mr. Zucconi had expressed to Mr. Sanchez his desire not to have anything to do with Fiore's proposal, which desire included a prohibition on Fiore's using his name or résumé. The plaintiff concludes that Fiore seriously overstated Mr. Zucconi's commitment to Fiore when Mr. Sanchez asserted in his oral presentation that "we have a verbal agreement that if Fiore is awarded this contract and I offer him the position of project manager and chief engineer, that he will accept upon contract award." [4] The plaintiff cites as evidence of Fiore's bad faith the latter's failure to offer the project manager job to Mr. Zucconi in the one-week window between the contract award and the notification that Orion filed its GAO protest.

The defendant contends that Fiore made no misrepresentation of any kind. Mister Sanchez had an oral agreement with Mr. Zucconi to work for Fiore if it were to win the contract, and that assurance was repeated in substance before the government's bid evaluators. The defendant underscores that Mr. Zucconi's résumé was not used in the oral presentation and, although it was included in Fiore's qualification package, the latter was sent to the government several days prior to Mr. Zucconi's signing the no-compete agreement with Orion. In the oral presentation itself, Mr. Zucconi's name was mentioned but once, and he appeared on only one power point slide. Moreover, the defendant argues, even if Fiore breached a private agreement between it and Mr. Zucconi, that fact has no bearing on whether the government was deceived as to Mr. Zucconi's availability. In other words, the defendant contends that Mr. Zucconi was ready, willing and able to work for Fiore upon award of the contract regardless of whether Fiore strictly adhered to any private agreement regarding Mr. Zucconi's involvement in the solicitation process.

The plaintiff derives its version of the "bait and switch" theory from a number of GAO and Boards of Contract Appeal cases. [5] Although these are at most merely persuasive authorities, *see, e.g., Fed. Mgmt. Sys., Inc. v. United States,* 61 Fed.Cl. 364, 367 n. 3 (2004); *CSE Constr. Co. v. United States,* 58 Fed.Cl. 230, 255 n. 15 (2003); *Transamerica Ins. Co. v. United States,* 31 Fed.Cl. 602, 605 n. 1 (1994); *Universal Restoration, Inc. v. United States,* 16 Cl.Ct. 214, 218 (1989), the Court will nevertheless briefly address them to demonstrate that the proposition for which they stand does not apply to the facts of this case.

All of the relevant board decisions cited by the parties deal with the situation where a

---

**4.** Videotape of Fiore Oral Presentation (Oct. 21, 2003).

**5.** "To demonstrate a 'bait and switch,' a protester must show not only that personnel other than those proposed are performing the services—i.e., the 'switch'—but also that: (1) the awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representa-

tion in evaluating the proposal; and (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work." *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 855 (1999) (quoting *Ann Riley & Assocs., Ltd.—Reconsideration,* B–271741, 97–1 CPD ¶ 122, at 2–3, 1997 WL 151040 (1997)).

bidder proposes the names of an employee or employees who (1) expressed no willingness to be employees of the bidder submitting the employee's name, *ManTech Advanced Sys. Int'l, Inc.,* B–255719, 94–1 CPD ¶ 326, 1994 WL 242282, *4; *Ultra Tech. Corp.,* B–230309, 89–1 CPD ¶ 42, 1989 WL 240233, at *3; (2) were unwilling or unable to show the level of commitment that the solicitation required of potential employees, *ManTech,* 1994 WL 242282, *4; *Aerospace Design & Fabrication, Inc.,* B–278896, 98–1 CPD ¶ 139, 1998 WL 253792, at *4–5; *see Agusta Int'l S.A.,* 69 Comp. Gen. 326, 328 (1990); (3) were unable to be the bidder's employee, *Aerospace,* 1998 WL 253792, at *5; *CBIS Fed., Inc.,* 71 Comp. Gen. 319, 324, 1992 WL 79112 (1992); or (4) were not directly asked whether they would accept employment, *Informatics, Inc.,* 57 Comp. Gen. 217, 223–24, 1978 WL 13361 (1978). No case or board decision cited supports the proposition that a bidder may not include the name of a potential employee with its bid if the person is willing to work for the bidder upon award of the contract. Nor has Orion presented this Court with any support for its proposition that a non-incumbent bidder must abide by an employment agreement between the incumbent and one of its incumbent employees, when that bidder wishes to hire the employee and the employee's inclusion in a proposal accurately reflects the availability of the employee if the bidder is awarded the contract.

In its analysis of the board cases it cites, the plaintiff focuses on whether the personnel offered in the successful bid had given permission to the bidder to use names and résumés in its bid. *ManTech,* 1994 WL 242282, at *4; *Aerospace,* 1998 WL 253792, *4, *8; *Ultra Tech.,* 1989 WL 240233, at *3. This focus, however, obscures the real issue of whether Fiore presented a description of its personnel that was responsive to the solicitation and an accurate representation of the facts. *ManTech,* 1994 WL 242282, at *7 ("While it is true that the RFP did not require letters of commitment, but only that the personnel be available, it does not follow ... that a misrepresentation that such commitments had been obtained would be immaterial."); *CBIS,* 71 Comp. Gen. at 323 ("[W]here an offeror knows prior to submis-

sion of its [best and final offer] that proposed key employees are no longer available, the offeror should withdraw the individuals and, in its [best and final offer], propose substitutes who will be available.") (citing *Omni Analysis,* 68 Comp. Gen. 300, 1989 WL 237449 (1989)). From the government's perspective, it is irrelevant to the success of the procurement whether an employee formally gives permission to a bidder to use his name in a bid if, in fact, the employee will work for the bidder if it is awarded the contract. *Cf. Unified Architecture & Eng'g, Inc. v. United States,* 46 Fed.Cl. 56, 64 (2000) (prong 3 of the "bait and switch" theory requires that the *unavailability* of the personnel have been *foreseeable* ); *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 855 (1999) (same).

The extent to which Mr. Zucconi had to commit to Fiore depends on what the solicitation required. Thus, so long as Mr. Zucconi expressed to Mr. Sanchez the requisite level of interest in the project manager position, the agreement between Mr. Zucconi and Orion preventing Mr. Zucconi's involvement with Fiore's bid is irrelevant to the government's decision to award the contract to Fiore. And a review of the solicitation indicates that the assurances Mr. Sanchez received, passed along to the government, were sufficient. The solicitation did not require letters of intent or résumés. Rather, all that was required in this regard was a list of "key personnel" critical to the mission. Admin. R. at 45 (Solicitation § H.6(b)). The level of commitment that Mr. Sanchez obtained from Mr. Zucconi—essentially, "if you win, I will work"—was sufficient to justify both the inclusion of Mr. Zucconi in Fiore's proposal and the government's expectation that Mr. Zucconi would in fact become Fiore's permanent PM if it were awarded the contract.

Furthermore, it appears that, based upon Mr. Zucconi's and Mr. Sanchez's responses to the plaintiff's interrogatories, Mr. Zucconi did not violate his contract with Orion. Mr. Zucconi had provided his résumé in response to a blind advertisement, knowing that his current employer's contract with the government would soon be up for bid and that he could possibly be out of a job. Independent

of this submission, Mr. Zucconi was approached by Mr. Sanchez on behalf of Fiore regarding employment in the event Fiore were awarded the contract. After Fiore's qualifications package was submitted, including Mr. Zucconi's résumé, Mr. Zucconi was required to sign an agreement containing the following language:

> I agree that as a team member, I will provide my resume exclusively to ORION for inclusion in ORION's proposal for the CCM follow-on contract. I will not provide my resume to any other company for inclusion in that company's proposal for the CCM follow-on contract. Nor will I help, in any manner whatsoever, other contractors in the preparation of a bid on the CCM contract.

Admin. R. at 607.

After signing the no-compete agreement with Orion, Mr. Zucconi informed Mr. Sanchez that he was not able to help Mr. Sanchez with Fiore's bid, and that he could not be offered as a potential employee in Fiore's presentation. Mr. Zucconi stated, however, that if Fiore were awarded the contract, his agreement with Orion would allow him to work for Fiore. Given these facts, Mr. Sanchez's statement during Fiore's oral presentation to ACA was accurate.[6] Ultimately, Orion's agreement did not affect Mr. Zucconi's availability to Fiore if the company were awarded the contract, and could not have any effect on whether Fiore communicated Mr. Zucconi's stated interest in working for the company were it to be awarded the contract. Moreover, it is clear from Mr. Sanchez's and Mr. Zucconi's responses to interrogatories that throughout the bid process, and at the time of the oral presentation, Mr. Zucconi

was ready, willing and able to work for Fiore after award. *See, e.g.,* Zucconi ¶¶ 1, 4, 5, 11, 19, 29; Sanchez ¶¶ 4, 6–7, 9, 13–14, 16, 22.

The plaintiff would also have this Court infer bad faith on the part of Fiore because the latter did not offer Mr. Zucconi a position immediately upon award of the contract.[7] Fiore responds that it was not required to make an immediate offer, and, in any event, within one week of the award an automatic stay of performance resulted from Orion's GAO protest, thus putting into question Fiore's contract and putting on hold any contingency hires. Before the stay was lifted, Mr. Zucconi accepted a position with the government, thus becoming unavailable.

The Court agrees with the intervenor that no bad faith can be inferred from its failure immediately to offer Mr. Zucconi the PM position. Mr. Zucconi was never slated to be the interim PM—that was Mr. Robert Rossow's job. *See* Admin. R. at 640 (slide from Fiore oral presentation identifying Rossow as "On-site Project Manager Designated PM until Mr. Zucconi assumes PM position after transition"). Moreover, Mr. Zucconi was still employed with Orion during the one week period between the award of the contract and the filing of Orion's GAO protest. Nothing in the solicitation required Fiore to make the offer during that period. Fiore had informed the government simply that it intended to have Mr. Zucconi occupying the PM position on the day Fiore fully assumed the duties of the contract and not before. *See* Sanchez ¶¶ 30–31. Far from being evidence of bad faith, Fiore's actions are fully consistent with its bidding representations and with the behavior of a rational and prudent company.

---

6. *Contra Aerospace,* 1998 WL 253792. In *Aerospace,* the initially successful bidder had asserted in its bid that a potential employee, Dr. A, was committed to working for the bidder if it were to win the contract. Doctor A had actually stated, however, that he was exclusively committed to another offeror, but would consider working for the bidder if they were to win. *Id.* at *6. The present case is distinctly different. Mister Zucconi wanted to work for Fiore, and was allowed to under the contract he signed with Orion. In *Aerospace,* by contrast, Dr. A was much more equivocal than Mr. Zucconi in his statement of willingness to work for the bidder.

7. In addition, the plaintiff attempts to find bad faith in Fiore's failure to make a *written* offer to Mr. Zucconi prior to the oral presentation. Although Mr. Zucconi did request that his proposed employment agreement with Fiore be in writing, *see* Zucconi ¶ 1, Fiore's failure to do so prior to the oral presentation raises no red flag, given that the Zucconi offer was contingent upon Fiore's winning the contract. For if Fiore were not to win the contract, then a formal written agreement would be unnecessary and a waste of time. No inference of bad faith can be reasonably drawn from this.

Fiore cannot be blamed for never hiring Mr. Zucconi when he made himself unavailable by accepting a government position. The solicitation does not envision a permanent list of key personnel; quite to the contrary, the solicitation expressly provides for changes in key personnel during the administration of the contract. *See* Admin. R. at 45 (Solicitation § H.6(c)); *id.* at 197 (Solicitation §§ C.1.5.1.2–C.1.5.1.4 (procedure for substituting personnel)). The loss of Mr. Zucconi from the Fiore team prior to the contract start was not so dramatic a development as Orion would make it seem. Mister Rossow, who was identified in the oral presentation as Fiore's interim PM, eventually became the permanent PM. *See* Sanchez ¶ 34. And as for the other personnel substitutions that the plaintiff cites, these are consistent with the solicitation's key personnel revision provisions. *See* Admin. R. at 45 (Solicitation § H.6(c)).

The plaintiff also seeks support from *Planning Research Corp. v. United States* ("*PRC*"), 971 F.2d 736 (Fed.Cir.1992). That case concerned a government computer maintenance contract. The solicitation expressly required "the submission of a résumé for each of the nineteen 'key' and eighty-two 'non-key' personnel to be committed for the first year's staffing [as well as] a statement defining the extent to which the corporation would commit the named key personnel to the contract." *Id.* at 737 (footnote omitted). The protestor submitted over one hundred résumés of its employees, but also disclosed that, if awarded the contract, it intended to rely upon the incumbent's staff. *See id.* at 738. When the government indicated that the staffing plan was a serious weakness in the bid, PRC changed its plans and repeatedly assured the government that it would staff the project with the employees whose résumés it had submitted. *Id.* Following its winning of the contract, PRC made numerous substitutions to its staff. As a result, PRC subsequently employed forty-two persons who were not listed in the bid and whose résumés were not submitted. *Id.* at

739. The GSA Board of Contract Appeals sustained the protest against PRC, finding that the latter had materially misrepresented its staffing to the government. The Federal Circuit affirmed in relevant part. Although the identity of proposed staff members was a critical component to the contract, *id.* at 741, PRC had "never even attempted, or intended, to provide the proposed personnel." *Id.* at 742 (quoting GSBCA opinion). Instead, PRC's post-award conduct was consistent with its original staffing plan, which it had supposedly abandoned during the bid process. *See id.* Accordingly, the Circuit concluded that in addition to PRC's conduct, the government's post-award conduct "contributed to the failure of this procurement to achieve full and open competition." *Id.* at 743.

The facts of this case, however, are substantially different from those of *PRC*. To begin with, the White Sands solicitation did not require letters of intent or résumés of key personnel. *See* Admin. R. at 13–61. Second, the government here, unlike in *PRC*, made no indication to any bidder that reliance upon incumbent employees in proposed staffing would be deemed a weakness. Third, and most importantly, the *PRC* Court accepted the Board's finding that PRC never intended to hire the persons whose résumés it had submitted. In stark contrast, the administrative record here fully supports the Court's conclusion, discussed above, that Fiore had every intention of hiring Mr. Zucconi (and had good reason to believe that he would accept) if it were awarded the White Sands contract, and that Fiore was frustrated in this intent due to actions beyond its control and contemplation. In other words, Fiore both "attempted" and "intended" to hire the key personnel in question. Hence, *PRC* is inapposite.

The Court therefore concludes that Fiore did not make a misrepresentation of any kind to the government in connection with its bid for the White Sands contract.[8]

**8.** Thus, the Court need not address the government's and the intervenor's additional argument that any Fiore misrepresentation pertaining to Mr. Zucconi's availability was immaterial to the government's award of the contract to Fiore. The Court does note, however, that Mr. Zucconi's presence on the list of Fiore's key personnel did not seem to be, in itself, something of great

### C. Whether the ACA failed to treat all proposals equally

■ The plaintiff contends that the ACA, through a number of ad hoc forbearances, gave Fiore preferential treatment in the bidding process. Orion alleges that the government overlooked Fiore's noncompliance with section L.1.4(b), which required that the presentation team include the proposed site manager. *See* Admin. R. at 56. Further, Orion argues that the government knew Mr. Zucconi was unavailable to Fiore, based on the government's eventual offer to him of a job with the CCM, and thus should not have credited the Fiore proposal with his presence on their team. And the plaintiff notes that the solicitation made no express provision for "contingent hires" such as Mr. Zucconi. The defendant disagrees with Orion and contends that the bids were treated equally and fairly. In particular, the government argues that section L.1.4 was fulfilled because Mr. Rossow—the proposed interim PM—was present. Second, the government notes that Mr. Zucconi's absence from Fiore's oral presentation did not require the ACA to forego any performance requirement in the contract or solicitation. And finally, the government asserts that the record does not support Orion's claim that Mr. Schuck, the CCM director, knew prior to the award to Fiore that Mr. Zucconi would accept a government position. The intervenor, citing 48 C.F.R. § 14.405, argues that even if Fiore failed to comply with section L.1.4(b), that provision is not a material matter and thus cannot serve as the basis for sustaining Orion's protest.

The Court agrees with the government that the presence of Mr. Rossow fulfilled section L.1.4(b). Mister Rossow was presented to the government as the initial and interim PM for Fiore. Although Mr. Zucconi was absent, he was not the only "proposed site manager." The solicitation does not require that the proposed *permanent* PM be present, and this Court can find no reason to

read such a requirement into the solicitation. Presumably, Mr. Rossow would be able to answer the same questions and make the same points as Mr. Zucconi; after all, he was intended to be the permanent assistant PM, *see* Admin. R. at 261, and as such was expected to have a competency equivalent to that of the PM. The Solicitation even specifically provides that the contractor "shall also appoint an alternate Project Manager with the same authority during the absence of the project manager." Admin. R. at 196 (Solicitation § C.1.5.1). If the alternate PM has the same authority as the PM in the PM's absence during contract performance, it is hard to see why the individual proposed for that position cannot exercise the authority of the proposed PM during the oral presentation. In short, Mr. Rossow's presence was more than adequate to meet the dictates of section L.1.4(b).

And even if the presence of Mr. Rossow did not fulfill the solicitation requirement, Orion was not thereby prejudiced because section L.1.4(b) is a "minor informality," such that a bidder's failure to fulfill its requirements is an oversight "that can be corrected or waived without being prejudicial to other bidders." 48 C.F.R. § 14.405. A bid defect qualifies as a minor informality under section 14.405 where its presence has only a negligible effect on the contract output. *See Hawaiian Dredging Constr. Co. v. United States,* 59 Fed.Cl. 305, 316 (2004) (non-original signature can be minor informality); *cf. Firth Constr. Co. v. United States,* 36 Fed.Cl. 268, 272 (1996) (incomplete Standard Form 1442 not minor informality); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 368–69 (1994) (unsigned revised BAFO not minor informality); *see generally Grade–Way Constr. v. United States,* 7 Cl.Ct. 263, 266 (1985). Here, the contract was for "research, engineering and analysis support to perform countermeasures/counter-countermeasures (CM/CCM) test and analysis activities on all

---

import to the evaluators. In their notes, the evaluators mention Mr. Zucconi by name only three times, *see* Admin. R. at 99, 100, 131, whereas Mr. Rossow, the proposed assistant PM, is mentioned four times, *see id.* at 99, 102, 122, 126. And Mr. Zucconi was proposed as a member of Orion's team, in the lesser position of

Deputy PM, and participated in its oral presentation. *See* Admin. R. at 283, 289, 959, 982. The government could reasonably assume that, no matter who was awarded the contract, Mr. Zucconi would be playing a role at the Center—as he ended up doing, only as a government employee.

precision-guided weapon systems, subsystems and related components." Admin. R. at 73. The physical presence of the proposed permanent PM at an oral presentation has little ultimate effect on the quality of services that a bidder may render under the contract. It may be ironic that Orion's no-compete agreement required the absence of Mr. Zucconi from Fiore's oral presentation, but irony is not the same as illegality. Orion can hardly lock him out of the room and then complain that he was not there—if anyone was disadvantaged by that arrangement, it was Fiore. But in any event, as the regulation states, a minor informality is something of "form and not of substance." The presence of Mr. Zucconi was a matter of form. Therefore, even if section L.1.4(b) were to be considered a requirement that was waived, the government acted fairly to both bidders.[9]

As for the plaintiff's contention that the government was aware of Mr. Zucconi's unavailability, there is no evidence supporting that position. What the record does support is the conclusion that Mr. Zucconi was actively seeking employment both prior to and after his initial contact with Mr. Sanchez regarding the White Sands follow-on contract. *See* Zucconi ¶ 44. Although Mr. Zucconi admitted that Mr. Schuck had, in passing, mentioned the possibility of a government job as early as August, 2003, *see id.* ¶ 33, Mr. Zucconi also avers plainly that until his selection as the White Sands technical director, he was available to serve as Fiore's PM. *Id.* ¶ 29. The record supports the defendant's contention that the government had no knowledge of Mr. Zucconi's "unavailability" prior to the contract award. Orion cannot show that the contract award was arbitrary or unlawful on that basis.

Finally, Orion alleges that it was prejudiced by the government's acceptance of Fiore's "contingent hire" designation of Mr. Zucconi. It bases this argument on the fact that the solicitation does not specifically state that such a designation may be made in a bidder's proposal. Pl.'s Reply at 3. This contention is without merit. Contingency hiring is certainly not unknown to government contracting. *See generally Info. Spectrum, Inc.*, B–256609.3, 94–2 CPD ¶ 251, 1994 WL 720462, *12; *Sys. Integration & Research, Inc.*, B279759.2, 99–1 CPD ¶ 54, 1999 WL 125444, *10. If non-incumbent bidders were uniformly forbidden from such practices, then the bidding process might often be distorted—as either their proposals would not accurately and fully reflect their capabilities and qualities, or they would be barred from employing some of the most experienced personnel. Either way, it appears the public would frequently lose as a result, and thus it is not surprising that Orion can cite no government policy against such hiring. If there is to be such a policy adopted, this is the job of the Executive and Legislative branches, not the courts.

For these and the aforementioned reasons, the Court finds no prejudice to Orion by any of the cited actions or alleged waivers of the government.

### III. CONCLUSION

Following a review of the parties' papers, the administrative record, and the transcript, the Court is unable to find that the ACA's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). In its oral presentation, Fiore made no misrepresentation—material or otherwise—regarding Mr. Zucconi's availability. The government evaluated the proposals of Fiore and Orion in a fair and evenhanded manner. Fiore was not given preferential treatment or special forbearance, nor was Orion prejudiced by any of the alleged improprieties or illegalities asserted against Fiore or the ACA.

Accordingly, the plaintiff's motion for injunctive relief is **DENIED** and the defendant's motion for judgment on the administrative record is **GRANTED**. The Clerk of

---

9. Thus, this case can be distinguished from the authorities cited by the plaintiff which deal with facial noncompliance of mandatory provisions. *See Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367–68 (Fed.Cir.1999); *Beta* *Analytics Int'l, Inc. v. United States*, 44 Fed.Cl. 131, 138–39 (1999); *Isometrics, Inc. v. United States*, 5 Cl.Ct. 420, 424 & n. 9 (1984) (failure to meet specification).

the Court is directed to enter judgment in favor of the United States.

IT IS SO ORDERED.